# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NICHOLAS CURRAULT; ANDRÉ CURRAULT; TROY CURRAULT;
LOWER RIVER SHIP SERVICE, LLC; SIDNEY FREEMAN,

*Plaintiffs-Appellees,*

v.

AMERICAN RIVER TRANSPORTATION CO., LLC, in personam,
and thirty-eight ARTCO Barges and their cargo, In rem, doing
business as Artco Fleeting Services,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of Louisiana
Case No. 2:23-cv-02542-WBV-KWR

## OPENING BRIEF OF DEFENDANT-APPELLANT

Robert N. Hochman
   *Counsel of Record*
Andrew Rodheim
H. Javier Kordi
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Phone: (312) 853-7000
rhochman@sidley.com

Marcelle P. Mouledoux
Morgan Kelley
MCGLINCHEY SAFFORD, PLLC
601 Poydras Street, Ste. 1200
New Orleans, Louisiana
Phone: (504) 596-2753
mmouledoux@mcglinchey.com

*Counsel for Defendant-Appellant American River Transportation Co., LLC*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**1) Plaintiff-Appellees:**

André Currault, Nicholas Currault, Troy Currault, Sidney Freeman, Lower River Ship Services, LLC

**2) Defendant-Appellant:**

American River Transportation Co., LLC ("ARTCO"), which discloses, pursuant to Federal Rule of Appellate Procedure 26.1, that ARTCO is a wholly owned subsidiary of Archer-Daniels-Midland Company, a publicly held corporation traded on the New York Stock Exchange under the abbreviation "ADM."

**3) Counsel for Plaintiffs-Appellees:**

Thomas M. Flanagan, Andrés F. Holmgren, Matthew Slaughter, FLANAGAN PARTNERS, LLP

Adam Davis,

ADAM DAVIS LAW FIRM

Stephen Huber, Taylor Bologna,

HUBER THOMAS

**4) Counsel for Defendant-Appellant:**

Robert N. Hochman, Andrew F. Rodheim, H. Javier Kordi,

SIDLEY AUSTIN LLP

Kevin M. Frey, Morgan Kelly, Marcelle P. Mouledoux,

MCGLINCHEY STAFFORD, PLLC

Michael McAlpine,

SCHOUEST BAMDAS SOSHEA BENMAIER & EASTHAM

Dated: December 16, 2024       /s/ Robert N. Hochman
                               Robert N. Hochman
                               *Counsel for Defendant-Appellant*
                               *American River Transportation*
                               *Co., LLC*

## REQUEST FOR ORAL ARGUMENT

Defendant-Appellant American River Transpiration, LLC ("ARTCO") respectfully requests oral argument. This appeal presents important legal issues regarding salvage claims under federal admiralty law, including whether claimants must have possessed, at the time of salvage, a specific intent to relieve from peril the property from which they seek to recover an award. This appeal also presents important issues regarding the applicable legal principles and scope of a court's discretion in determining salvage awards. Resolution of these questions will have far-reaching ramifications for salvage actions on navigable waters. Because the decisional processes will be significantly aided by oral argument, it is appropriate here under Fed. R. App. P. 34(a)(2).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................i

REQUEST FOR ORAL ARGUMENT ...................................iii

TABLE OF AUTHORITIES................................................vi

INTRODUCTION ........................................................ 1

STATEMENT OF JURISDICTION....................................3

STATEMENT OF ISSUES PRESENTED ...........................4

STATEMENT OF THE CASE ............................................ 4

    A.    The Breakaway Incident On The Mississippi River. .....4

    B.    Plaintiffs Sue ARTCO For Property Damage. .................7

    C.    The Salvage Lawsuit And Trial. .......................................9

    D.    The District Court's Ruling. ..............................................13

SUMMARY OF THE ARGUMENT.......................................16

STANDARD OF REVIEW....................................................21

ARGUMENT.........................................................................21

I.    Plaintiffs' Salvage Claim Fails As A Matter Of Law Because Plainitffs Did Not Act With Specific Intent..............21

    A.    Salvage Law Requires Plaintiffs To Prove Specific Intent To Benefit The Salved Property. ..........................22

    B.    A Specific Intent Requirement Serves The Policy Aims Of Salvage Law. .................................................................31

    C.    The Specific Intent Requirement Disqualifies Plaintiffs From Recovering A Salvage Award...................................37

II.     The District Court Abused Its Discretion And Applied
        Erroneous Legal Principles In Awarding 20% Of The
        Value Of The Salvaged Property...................................................40

        A.      The District Court Abused Its Discretion In Setting A
                Percentage Far In Excess of Historical Practices
                Without Justification............................................................41

        B.      The District Court's Award Also Is Based On Legal
                Errors.....................................................................................47

**CONCLUSION** ...........................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*The Acorn*, 1 F. Cas. 56 (D. Mass. 1857)..................................................27

*The Acre*, 195 F. 1022 (E.D.N.Y. 1912) ....................................................29

*Allseas Mar., S.A. v. M/V MIMOSA*,
    812 F.2d 243 (5th Cir. 1987)..............................21, 41, 45, 49

*Atlantis Marine Towing, Inc. v. THE M/V PRISCILLA*,
    491 F. Supp. 2d 1096 (S.D. Fla. 2007)........................18, 29

*B.V. Bureau Wijsmuller v. United States*,
    702 F.2d 333 (2d Cir. 1983) ....................................22, 24, 25

*Berry v. Boat Giannina B., Inc.*,
    460 F. Supp. 145 (D. Mass. 1978)................................*passim*

*The Blackwall*, 77 U.S. 1 (1869)................................14, 22, 32

*The City of Columbia v. The City of Atlanta*,
    56 F. 252 (S.D.N.Y. 1893) ....................................................29

*Columbus-America Discovery Grp. v. Atl. Mut. Ins. Co.*,
    974 F.2d 450 (4th Cir. 1992)..............................................23

*Compania Galeana, S.A. v. Motor Vessel Caribbean Mara*,
    565 F.2d 358 (5th Cir. 1978)..............................................45

*Devine v. United Transp. Co.*,
    1957 A.M.C. 175, 1956 WL 89486 (W.D. Wash. July 30,
    1956) ......................................................................................25

*Dorothy J v. City of New York*,
    749 F. Supp. 2d 50 (E.D.N.Y. 2010) ..................................49

*Elrod v. Luckenbach S.S. Co.*,
    62 F. Supp. 935 (S.D.N.Y. 1945)........................................33

*Firemen's Charitable Ass'n v. Ross,*
  60 F. 456 (5th Cir. 1893) ....................................................... 34

*Hener v. United States,*
  525 F. Supp. 350 (S.D.N.Y. 1981) .................................. 23, 36

*The Hesper,* 122 U.S. 256 (1887) .......................................... 21

*Kuhr v. Sea-Alaska Prods., Inc.,*
  1986 A.M.C. 2299 (W.D. Wash. Oct. 21, 1985) ................... 46

*The Lamington v. Merritt,*
  86 F. 675 (2d Cir. 1898) ....................................................... 25

*Margate Shipping Co. v. M/V JA Orgeron,*
  143 F.3d 976 (5th Cir. 1998) ........................................ *passim*

*Mason v. Blaireau,*
  6 U.S. (2 Cranch) 240 (1804) ............................................... 22

*Merritt & Chapman Derrick & Wrecking Co. v. United States,*
  274 U.S. 611 (1927) .................................................. 18, 28, 39

*Offshore Marine Towing, Inc. v. Gismondi,*
  504 F. Supp. 3d 1349 (S.D. Fla. 2020) ................................ 24

*The Omaha,* 71 F. Supp. 314 (D.P.R. 1947) ......................... 43

*R.M.S. Titanic, Inc. v. Haver,*
  171 F.3d 943 (4th Cir. 1999) ................................................ 35

*The SABINE,* 101 U.S. 384 (1879) ......................................... 32

*The Sahara,* 246 F. 141 (D. Md. 1917) ................................. 25

*Saint Paul Marine Transp. Corp. v. Cerro Sales Corp.,*
  505 F.2d 1115 (9th Cir. 1974) ............................................. 46

*The San Cristobal,* 215 F. 615 (S.D. Ala. 1914), *aff'd* 230 F.
  599 (5th Cir. 1916) ....................................................... 24, 29

*The San Cristobal*, 230 F. 599 (5th Cir. 1916) ............................ 18, 28, 39

*The Sandringham*, 10 F. 556 (E.D. Va. 1882) ......................................... 42

*Seven Coal Barges*, 21 F. Cas. 1096 (C.C.D. Ind. 1870) ......................... 22

*Petition of Sun Oil Co.*,
  342 F. Supp. 976 (S.D.N.Y. 1972), *aff'd*, 474 F.2d 1048 (2d
  Cir. 1973) ............................................................................... 18, 27, 39

*Sun Oil Co. v. Govostes*,
  474 F.2d 1048 (2d Cir. 1973) ............................................................ 27

*Sunglory Maritime, Ltd. v. PHI, Inc.*,
  212 F. Supp. 3d 618 (E.D. La. 2016) ...................................... 29, 30, 50

*Terral River Serv., Inc. v. SCF Marine Inc.*,
  20 F.4th 1015 (5th Cir. 2021) ............................................................ 33

*United States v. EX-USS CABOT/DEDALO*,
  297 F.3d 378 (5th Cir. 2002) .................................................. 21, 23, 34

*Usatorre v. Compania Argentina Navegacion Mihanovich, Ltda.*,
  64 F. Supp. 370 (S.D.N.Y. 1945), ...................................................... 46

*Westar Marine Servs. v. Heerema Marine Contractors*, S.A.,
  621 F. Supp. 1135 (N.D. Cal. 1985) .................................................. 49

## Statutes

28 U.S.C. § 1291 ..................................................................................... 4

28 U.S.C. § 1331 ..................................................................................... 4

28 U.S.C. § 1333 ..................................................................................... 3

## Other Authorities

*Benedict on Admiralty*, Vol. 3A ................................................... *passim*

Jessica Victoria Hidalgo, *A Study in Salvage,* Loy. Mar. L.J.
  49 (2019) .......................................................................................... 24

Robert Force, *Elements of "Pure Salvage" Claims*, FJC: Admiralty & Maritime Law (2nd ed.) (2013)................................ 18, 23

William M. Landes & Richard A. Posner, *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism*, 7 J. Leg. Stud. 83 (1978)................ 31, 36

## <u>INTRODUCTION</u>

During the peak hours of Hurricane Ida on August 29, 2021, several barges owned by Appellant American River Transportation Company, LLC ("ARTCO") broke from their moorings in the Mississippi River. The barges were initially prevented from flowing downriver by the force of the winds. As the storm passed and its effects weakened, however, the barges began flowing downriver to the vessels and docks of Lower River Services, LLC ("Lower River"), where the owners and crew of Lower River—Captain Nicholas Currault, André Currault, and Troy Currault, together with Captain Sidney Freeman from neighboring Port Ship Service (collectively with Lower River, "Plaintiffs")—had set up for the night to monitor their own fleet. After one of ARTCO's barges struck one vessel in the Lower River fleet, the individual Plaintiffs began efforts to divert ARTCO's barges away from their property. They came to worry that merely pushing the barges downriver past them—as they had initially planned—could leave property downriver exposed to damage. So they set about to beach ARTCO's barges.

Plaintiffs have settled their claims for property damages arising out of the incident. This case, brought almost a year after initially suing

ARTCO *only* for property damage, raises important issues concerning liability and the calculation of awards for salvage in admiralty law.

Salvage is the legal right to a reward for successful services voluntarily rendered to a vessel in peril. Born of the public interest in promoting safety and efficiency in the face of the inherent perils of commerce at sea, it is a longstanding doctrine that comes with important limitations tied to the public policies it serves. Salvage law, as it has evolved, is designed to provide a reward—a special inducement beyond that which the common law would otherwise provide—for taking risks to benefit other specific vessels in peril.

The district court here entered a salvage judgment for Plaintiffs and determined that they were entitled to an award of $3,761,500.00, some 20% of the value of the barges and their cargo. ROA.1094 ¶ 59. But the court never found, and the record does not support a finding, that the Plaintiffs specifically intended to benefit ARTCO and to protect ARTCO's barges when it beached them. Awarding salvage in the absence of specific intent to save the defendant's property is a novel weakening of the constraints on salvage law, threatening the policies it serves. Federal admiralty law has long recognized that intent is

essential in determining whether a plaintiff is entitled to a salvage award. Consistent with a specific intent requirement, modern courts withhold relief in cases of inadvertent or unintentional salvage. Controlling law requires specific intent to benefit the defendant's property to receive a "reward" for salvage. This Court should reverse the judgment and preserve that longstanding legal rule.

In addition, the district court's award of 20% of the value of the salvaged property is out of line with precedent and, if the judgment is not reversed, should be substantially reduced. When reviewing a district court's salvage award, this Court compares that award to salvage awards issued in other cases. Here, comparable cases require a considerably lesser award. Moreover, the legal errors infecting the court's calculations—including demanding that ARTCO pay *extra* for Plaintiffs' voluntary efforts to protect *other* property downriver—also confirm that the award is excessive.

For these reasons, the judgment should be reversed, or, at a minimum, modified.

## STATEMENT OF JURISDICTION

Plaintiffs' claims arose under general maritime law, 28 U.S.C.

§ 1333, and the International Convention on Salvage, giving the district court federal-question jurisdiction under 28 U.S.C. § 1331. The district court issued a final judgment on June 28, 2024. ROA.1096-97. This Court has appellate jurisdiction under 28 U.S.C. § 1291. Defendant-Appellant timely filed a notice of appeal on July 26, 2024. ROA.1098-99.

## STATEMENT OF ISSUES PRESENTED

1.      Did the district court err when it ruled that the law does not require a salvage plaintiff to act with the specific intent to relieve the defendant's salvaged property from peril, instead allowing a generalized intent to protect other property to warrant a salvage award against the defendant?

2.      Did the district court abuse its discretion and disregard settled legal principles in awarding of 20% of the value of the salvaged property?

## STATEMENT OF THE CASE

### A.      The Breakaway Incident On The Mississippi River.

This dispute began as a claim exclusively for property damage caused by a barge breakaway incident on the Lower Mississippi River after Hurricane Ida made landfall in Louisiana. ROA.1043-44 ¶ 1. ARTCO's property and fleet were located upriver from the property and

4

fleet of Plaintiff Lower River Services. ROA.1045-46 ¶¶ 1-5. ARTCO followed its hurricane plan in preparing for the storm. ROA.1908:5-24. In accordance with that plan, and in light of the danger to life posed by the hurricane, ARTCO's fleet was left unattended. ROA.1047-48 ¶ 16.

As the hurricane approached, Plaintiffs decided to stay on the river to protect their own fleet. *See, e.g.*, ROA.1160:23-25 (Nicholas Currault: testifying that Plaintiffs' "plan" was to "stay on [their] vessels and man the fleet" in case of any of their lines broke loose); ROA.1161:18-1162:5 (Nicholas Currault: testifying that the reason that Plaintiffs stayed on the river during the storm was in case "anything did break loose" on their vessels and to "keep everything together"); ROA.1612:19-20 (Sidney Freeman: testifying he was out on the river in order to "watch[] my boats"). When the hurricane arrived, Plaintiffs remained with the Lower River fleet. ROA.1048 ¶¶ 14-15.

Captain Nicholas Currault piloted the SHELL FUELER, a Lower River vessel, with André Currault and Captain Sidney Freeman onboard. ROA.1048 ¶ 14. Though not employed by Lower River, Captain Freeman stayed on the SHELL FUELER from which he could watch his employer's vessels upriver. ROA.1169:4-1170:12. The SHELL

FUELER was tied to a dock and faced downriver to monitor the Lower River fleet. ROA.1048 ¶ 14. Troy Currault was aboard a different Lower River vessel, the SAINT CHARLES, moored 180 feet downriver from the SHELL FUELER. ROA.1048 ¶ 14.

At some point during the evening, several barges that had broken away from their moorings began to flow downriver towards Lower River's fleet. ROA.1049 ¶ 17. Some, but not all, of those barges belonged to ARTCO. ROA.1355:6-15. Around 10 p.m., the first allision between an ARTCO barge and Plaintiffs' property occurred, with a barge hitting the SHELL FUELER and damaging the boat's moorings and mechanical systems. ROA.1049 ¶ 18. One hour later, a second ARTCO barge struck the SAINT CHARLES. ROA.1050 ¶ 20.

Soon after, three more ARTCO barges headed towards Plaintiffs. ROA.1050 ¶ 21. "[I]n order to prevent the breakaway barges from colliding" with Lower River's fleet, Captain Nicholas Currault used the SHELL FUELER'S propellors to generate turbulence that "push[ed] the barges away." ROA.1050 ¶ 21; *see also* ROA.1193:24-1194:1 (Nicholas Currault testifying that his goal was to "try to get [ARTCO's barge] to where it will not hit the SHELL FUELER"); ROA.1549:25-1550:1 (Sidney

Freeman testifying that Nicholas Currault acted "to kind of back [ARTCO's barge] off from hitting him").

With additional barges continuing to flow downriver towards the Lower River fleet, Plaintiffs devised another plan. With Troy Currault acting as a lookout to "notify[]" Nicholas Currault of barges he saw "coming downriver" towards the fleet, ROA.1396:9-10, Nicholas Currault used the SHELL FUELER to slow and eventually beach the barges downriver, away from Lower River's fleet, where they would no longer "pose[] a threat" to Plaintiffs. ROA.1064 ¶ 14. During this operation, several barges came "in close" to "hit[ting]" the Lower River fleet. ROA.1302:8-14. In total, the trial court concluded that 23 ARTCO barges were pushed onto the river bank until later recovered. ROA.1051 ¶ 26.

### B.    Plaintiffs Sue ARTCO For Property Damage.

Plaintiffs (other than Sidney Freeman) sued ARTCO in 2022, claiming $569,500 in damages allegedly caused by ARTCO's barges hitting Lower River property. ROA.1043 ¶ 1 (citing Complaint in *Lower River Ship Service v. American River Transportation Co.*, Civ. No. 2:22-cv-02979 (E.D. La.)).

In a deposition taken in connection with the property damage case—before Plaintiffs filed the Salvage Complaint leading to this appeal—Tory Currault testified that Lower River's plan for hurricane preparedness "was just for nothing to break loose." ROA.289:14-15. Troy further testified that amid the barge breakaway incident, at around 2:00 am, he informed ARTCO that its barges "were hitting us and giving us problems." ROA.293:4-11. As he put it, he and Nicholas Currault worked to "dam[] off the barges hitting us." ROA.293:17-19. The "[o]nly thing Lower River did during the storm," according to Troy's deposition testimony, "was rounding [ARTCO's barges] up and shifted some away from us, from hitting us." ROA.306:11-15. When directly asked whether the Lower River did "work to salvage any of ARTCO's barges after the hurricane," Troy responded, "No." ROA.306:24-307:1; *see also* ROA.308:25-309:1 ("We did not do no salvage."). Nicholas Currault testified similarly at his deposition in the property damage case, stating that he "wasn't looking … for other people's stuff," but was instead worried about his "crew at that time" and "nobody else." ROA.1280:7-17 (quoting deposition testimony).

The property damage case later settled. ROA.1044 ¶ 2.

### C. The Salvage Lawsuit And Trial.

Ten days *after* Troy Currault's testimony in the property damage case expressly *denying* that any salvage of ARTCO's barges had occurred, Plaintiffs filed a Marine Salvage Complaint on July 17, 2023. ROA.10-17. Plaintiffs alleged that they "successfully and voluntarily" rescued ARTCO's barges from "marine perils generated by Hurricane Ida." ROA.12. ARTCO sought partial summary judgment on Plaintiff Troy Currault's salvage claim, pointing to his property damage deposition testimony and arguing that Tory Currault did not intend to salvage ARTCO's barges. ROA.274-278. The district court disagreed, ruling that ARTCO's argument that Troy Currault could not show that he had an "intent to save ARTCO's property from peril" was "baseless," suggesting salvage law has no intent requirement. ROA.906-908.

During the subsequent trial, Plaintiffs did not deny that they were on the river to protect their own property, or that they successfully diverted ARTCO's barges away from their property. To the contrary, Plaintiffs consistently testified that they stayed on the river to protect their own property. *See, e.g.*, ROA.1161:19-1162:5 (Nicholas Currault: testifying that Plaintiffs stayed on the river during the storm to "keep

everything together" on their vessels); ROA.1421:12-20 (Tory Currault: testifying that Plaintiffs' "purpose" was to "protect [their] equipment"); ROA.1608:9-12, 1609:13-16 (Sidney Freeman: testifying that his "purpose" was to "protect" his employer's "stuff"). Plaintiffs no longer took the position, however, that they were *only* protecting the Lower River fleet, despite Troy Currault's deposition testimony in the property damage case. Plaintiffs instead asserted that they chose to beach the barges downriver from the Lower River fleet in order to prevent harm that might have occurred if ARTCO's barges continued to drift downriver.

Captain Nicholas Currault testified, for example, that when he realized the breakaway barges would continue coming, he determined he needed a plan other than to use the SHELL FUELER to "just push the[] barges out into the middle of the river," which he considered to be the "easiest thing." ROA.1203:16-18. His father, Troy Currault, had disapproved of merely pushing the barges further into the river because it would just "affect[] the next guy downriver." ROA.1203:19-21; *see also* ROA.1206:21-23 ("[Troy Currault] said to me, if you push them out into the river, the only thing you're doing is F'ing the next guy, you know,

the next guy downriver, you know."); ROA.1394:4-27 (Troy Currault: testifying that Plaintiffs' goal in rounding up the barges was to protect the "next guy"). Nicholas Currault understood Troy to be worried about "the fleets below," such as the "Magnolia red flag fleet," which kept several barges with dangerous chemicals. ROA.1234:24-1235:6, 1315:9-1316:8, 1356:14-25. Consistent with this concern, Nicholas Currault pushed the barges onto the Mississippi's river bank:

> You don't want to just let these barges keep going down. It's going to be a domino effect. Like they got Magnolia Marine, Magnolia fleet which is right below us that's nothing but red flag and crane barges, that's petroleum barges and everything else. So you want to stop these barges if it's possible at any means. To stop further disaster from other barges breaking loose.

ROA.1205:15-23. According to Nicholas, pushing ARTCO's barges into the bank and stopping them from striking property downriver was "the right thing" to do, rather than let them float downriver and harm other property just as the barges had damaged their own. ROA.1212:3, 1243:25-1244:2; *see also* ROA.1220:16-19 (Nicholas Currault: testifying that he was "concerned about [the ARTCO] barges breaking [his] fleet loose and then going downriver and causing more damage"). André Currault likewise testified that Plaintiffs were collecting ARTCO's

barges "to make sure they didn't hit other property in the area." ROA.2276:10-16.

Captain Sidney Freeman, who was also on the SHELL FUELER but worked for a neighboring outfit, also testified that Plaintiffs' actions were driven by an intent "to save and protect everything around us and that's what we did." ROA.1589:22-24. As he explained, "We were there to protect. I was there to protect [my own company's] stuff, but it turned out we *wound up* saving, saving ARTCO barges." ROA.1609:15-16 (emphasis added). Troy Currault testified similarly. When asked what the crew's "purpose" was for being out in the storm, he said they were on the river "[t]o protect our equipment and we *wound up* having to help ARTCO at the same time and help other companies for not getting damage done to them." ROA.1421:12-20 (emphasis added).

In short, Plaintiffs' trial testimony confirmed that Plaintiffs decided to deal with ARTCO's barges in whatever way would protect both the Lower River fleet and, according to them, other third-party property downriver from the breakaway vessels. No Plaintiff testified that beaching ARTCO's barges was devised as a strategy to protect ARTCO's barges. Instead, it was a strategy designed to protect

Plaintiffs' own property, plus downstream property, that *happened* to also relieve ARTCO's barges from a different danger—distinct from the danger of being forced into the bank—that continuing to float downriver posed.

### D. The District Court's Ruling.

The district court ruled in favor of Plaintiffs and awarded them $3,761,500, or 20% of the value of the ARTCO barges at issue. ROA.1065 ¶ 17, ROA.1094.

The court first held that Plaintiffs carried their burden with respect to several elements of a salvage claim not in dispute here. ROA.1065 ¶ 17. On the key disputed issue—Plaintiffs' specific intent to relieve the defendant's property from peril—the district court concluded that "a finding of intent" was not "necessary in order for a court to make a finding of salvage," holding that such a requirement is "not []" supported by the law." ROA.1064 ¶ 14.

The district court never found, as a matter of fact, that Plaintiffs acted with the specific intent to relieve ARTCO's barges from peril. Rather, the district court, ruling in the alternative in the event that *some* intent was required, found that Plaintiffs' intent "went beyond

protection of Lower River's property and included an intent to save non-Lower River property as well." ROA.1064 ¶ 14. Put simply, it is clear that, as a matter of fact, the *most* the record could support was that Plaintiffs intended to protect other, third-party property. Plaintiffs were not trying to preserve and protect ARTCO's property but rather were trying to prevent ARTCO's property from harming other property downriver.

With respect to a dollar sum for the salvage award, the district court evaluated the ten factors set forth in the International Convention on Salvage, which correspond to the *Blackwall* factors. ROA.1068-1083 ¶¶ 23-36; *see The Blackwall*, 77 U.S. 1 (1869). The court found:

1. *The salved value of the vessel.* The fair market value of the salvaged property—the 23 barges—was $18,807,500.00. ROA.1069-70 ¶ 27.

2. *Prevention of environmental damage.* Plaintiffs failed to establish that their efforts prevented environmental harm. ROA.1070 ¶ 28.

3. *Salvor's measure of success.* Plaintiffs were "highly successful" in "averting the downriver movement, destruction, and sinking" of ARTCO's barges. ROA.1072 ¶ 29.

4. *Nature and degree of the danger to salved vessel.* ARTCO's barges were in "imminent danger of complete loss." ROA.1073-74 ¶ 30.

5. *Skill and efforts of salvors*. Plaintiffs exhibited a "very high level" of skill and efforts. ROA.1074-75 ¶ 31.

6. *Salvor's time and expenses incurred*. Plaintiffs spent 10 hours salving, but did not establish any out of pocket expenses. ROA.1076-77 ¶ 32.

7. *Risks incurred by salvors*. Plaintiffs incurred an "extremely high risk" in beaching the barges. ROA.1077-80 ¶ 33.

8. *Promptness of services rendered*. Plaintiffs "reacted quickly to the ARTCO breakaway barges." ROA.1080-81 ¶ 34.

9. *Availability and use of salvage tools and vessels*. Plaintiffs utilized the SHELL FUELER. ROA.1081-82 ¶ 35.

10. *State of readiness, efficiency, and value of salvor's equipment*: SHELL FUELER was ready, efficient, and worth $500,000. ROA.1082-83 ¶ 36.

On balance, the district court found the factors "warrant[ed] a substantial award," concluding that the facts were "similar" in some respect to those at issue in this Court's opinion in *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976 (5th Cir. 1998). ROA.1086 ¶ 42. In other respects, however, the district court noted that *Margate* was different. For example, the salvors in *Margate* had worked for more than 2 days, not merely 10 hours; the salvors in *Margate* incurred significant risk of environmental liability by using an oil tanker to conduct salvage, while Plaintiffs here did not establish such risks to

15

themselves; and the property put at risk in the salvage efforts in *Margate* was significantly more valuable than the value of the SHELL FUELER put at risk here. ROA.1088-89 ¶ 46.

In *Margate*, this Court affirmed the "district court's specific choice of percentage ..., because it [was] consistent with the historical pattern in cases of similar nature." 143 F.3d at 995. Applying that percentage—12.5%—to a modified salved property value yielded an award of $4.125 million. *Id*. Here, the court found it "appropriate to award a substantial salvage award to the Salvage Plaintiffs, but in an *amount* less than that awarded in *Margate*." ROA.1089 ¶ 47 (emphasis added). The district court chose to award 20% of the value of ARTCO's barges. ROA.1090 ¶ 49. The court offered no explanation for why this case warranted an award that, as *a percentage* of the salved property, significantly exceeded the percentage widely recognized as the outer limit for salvage, reserved for truly extraordinary cases.

## <u>SUMMARY OF THE ARGUMENT</u>

**I.** Under settled principles, a reward is owed to salvors that succeed in efforts designed to relieve specific property from peril. That necessarily means, as numerous courts have recognized, that the

salving act must be done with the *specific intent* to relieve the defendant's property from peril. To allow a salvage reward for acts undertaken for *other* reasons would decouple salvage law from its purposes.

Without this limit, salvage law could quickly morph from a legally mandated reward for taking on reasonable risk to save specific property into an after-the-fact effort to find *any* valuable property arguably saved by one's actions. Such a hindsight-based approach distorts incentives. Given the inherent dangers in undertaking salvage efforts, dangling the prospect of lottery-like "rewards" risks *over*encouraging dangerous acts and diminishing safety at sea. A party should be forced by the law to grant a salvor a "reward" *only* when the salvor specifically intended to relieve the plaintiff's property from peril when undertaking successful salvage efforts.

The district court's ruling rejects that essential principle. The court first broadly ruled that an intent requirement is not "supported by the law." ROA.1064 ¶ 14. But the court ignored admiralty case law stretching over a century which confirms that intent—and in particular, specific intent—is a qualifying condition for salvors. This intent

requirement disqualifies salvors from obtaining compensation when the relief conferred on the salved vessel is inadvertent or incidental to other intentions. *See, e.g.*, *Merritt & Chapman Derrick & Wrecking Co. v. United States*, 274 U.S. 611, 611-13 (1927); *The San Cristobal*, 230 F. 599, 600 (5th Cir. 1916); *Atlantis Marine Towing, Inc. v. THE M/V PRISCILLA*, 491 F. Supp. 2d 1096, 1101 (S.D. Fla. 2007); *Berry v. Boat Giannina B., Inc.*, 460 F. Supp. 145, 149 (D. Mass. 1978); *Petition of Sun Oil Co.*, 342 F. Supp. 976, 980 (S.D.N.Y. 1972), *aff'd*, 474 F.2d 1048 (2d Cir. 1973); *see also* Robert Force, *Elements of "Pure Salvage" Claims*, FJC: Admiralty & Maritime Law 164 (2nd ed.) (2013) (characterizing the intent rule as a "specific intent" requirement). Salvage law does not reward plaintiffs under a pre-existing duty to protect property; in such cases, no additional incentive to act is necessary or socially beneficial. Likewise, salvage law does not reward a plaintiff for unintended benefits, where the additional incentive of a reward will not produce more socially beneficial action. The district court thus erred as a matter of law.

The court alternatively ruled that if the law imposes *some* intent requirement on salvors, then that requirement is satisfied here because,

it found, Plaintiffs' "intent went beyond protection of [their own] property and included an intent to save [other] property as well." ROA.1064 ¶ 14. That finding cannot save this judgment. That is not a finding that Plaintiffs intended to protect and save ARTCO's barges from peril. The court made no such finding of specific intent to benefit ARTCO's barges because the record simply fails to support any such finding. The district court surely could, and did, credit Plaintiffs' testimony that they were motivated by a desire to mitigate harm to their own property and their downriver neighbors. But there is no credible (or credited) testimony that when the Plaintiffs beached ARTCO's barges, they were specifically intending to confer a benefit on ARTCO. The judgment in favor of Plaintiffs should be reversed.

**II.** Even if the judgment could survive, the reward should be significantly reduced. The district court deployed a flawed analysis to arrive at the salvage award. The court deviated from the guidance provided in the case law and awarded an amount in a percentage far in excess of the award in *Margate*—a self-described "rare" case, where a 12.5% multiplier led to "the largest maritime salvage award in recorded history." 143 F.3d at 979-80, 995. The district court, without any

explanation, found Plaintiffs entitled to 20% of the value of ARTCO's barges. In so doing, the court abused its discretion by ordering an excessive award that even its own explanation could not justify.

In addition, the court allowed legally erroneous considerations to infect its determination of the amount of the award.

First, the court offered no explanation for its view that ARTCO's barges were in danger of a total loss when Plaintiffs acted, other than its finding that the barges faced sufficient imminent peril to warrant an award. But the imminent peril standard that warrants an award is considerably less than a threat of total loss. There is simply no reason to believe ARTCO's barges faced a risk of total loss.

Second, the court's outlier award was plainly driven by its finding that "the rest of the Mississippi River, benefited greatly" from Plaintiffs' efforts in beaching the barges to prevent "further damage to other property." ROA.1073 ¶ 29(c). But speculation about potential benefits to third-parties should play no role in the calculation of the award. Doing so impermissibly widens the scope of a calculation designed to capture only the "twin considerations" of cost to the salvor and benefit to the salvee. *Margate*, 143 F.3d at 987. Much like the district court's decision

to do away with the specific intent requirement, the district court's consideration of improper third-party benefits threatens to distort the incentive structure of salvage law in ways that undermine salvage law's salutary purposes.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions *de novo*. *United States v. EX-USS CABOT/DEDALO*, 297 F.3d 378, 381 (5th Cir. 2002). This Court reviews the district court's award computation for an abuse of discretion or legal error, and may modify the award on appeal. *The Hesper*, 122 U.S. 256, 266 (1887); *Allseas Mar., S.A. v. M/V MIMOSA*, 812 F.2d 243, 246-47 (5th Cir. 1987).

## ARGUMENT

### I. Plaintiffs' Salvage Claim Fails As A Matter Of Law Because Plainitffs Did Not Act With Specific Intent.

The district court erroneously held that an intent requirement was not "supported by the law" of salvage. ROA.1064 ¶ 14. In so holding, the court departed from centuries of doctrine and well-settled policy considerations that rightly require salvors to specifically intend to save a defendant's property from peril. Under the proper legal standard, judgment as a matter of law should have been entered in

favor of ARTCO.

## A. Salvage Law Requires Plaintiffs To Prove Specific Intent To Benefit The Salved Property.

"Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril on the sea[.]" *The Blackwall*, 77 U.S. at 12. It is a reward, above and beyond that which the common law provides for similar voluntary acts undertaken on land to benefit property owners. *See Mason v. Blaireau*, 6 U.S. (2 Cranch) 240, 266 (1804); *Benedict on Admiralty*, Vol. 3A § 232: Why The Award Is Given (1974) (hereafter "*Benedict*"). The law of salvage has evolved from ancient times and survives as a special rule in admiralty to promote safety in the face of the inherent dangers of travel by navigable water, and to make maritime commerce more efficient despite those dangers. *Margate*, 143 F.3d at 984 ("Because of the peculiar dangers of sea travel, public policy has long been held to favor a legally enforced reward in this limited setting, to promote commerce and encourage the preservation of valuable resources for the good of society."); *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 337 (2d Cir. 1983) ("The law of salvage originated to preserve property and promote commerce."); *Seven Coal*

*Barges*, 21 F. Cas. 1096, 1097 (C.C.D. Ind. 1870) ("The very object of the law of salvage is to promote commerce and trade, and the general interests of the country, by preventing the destruction of property, and to accomplish this by appealing to the personal interests of the individual as a motive of action[.]"); *see also Benedict*, Vol. 3A § 232.

The district court correctly recognized that to succeed on a salvage claim, Plaintiffs must show "marine peril," "voluntary service rendered when not required as an existing duty or from a special contract," and "success in whole or in part, or contribution to the success of the operation." ROA.1060 ¶ 6 (quoting *EX-USS CABOT/DEDALO*, 297 F.3d at 381). However, the district court rejected the requirement—recognized in both case law and by leading admiralty law scholars—that for would-be salvors to receive compensation for rescuing an imperiled vessel, they "must have the intention ... to save the property involved." *Columbus-America Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 460-61 (4th Cir. 1992) (quoting *Hener v. United States*, 525 F. Supp. 350, 357-58 (S.D.N.Y. 1981)); *see also* Robert Force, *Elements of "Pure Salvage" Claims*, FJC: Admiralty & Maritime Law 164 (2nd ed.), 2004 WL 2895915 (2013) ("The would-be salvor must have the specific

intent to confer a benefit on the salved vessel."); Jessica Victoria Hidalgo, *A Study in Salvage*, 18 Loy. Mar. L.J. 49, 64 (2019) (discussing intentionality and voluntariness as two components of salvage, with the intent requirement being a "specific intent" to save the imperiled vessel). Put slightly differently, the services that relieved the vessel from peril must have been "*designed to* relieve" the vessel from that peril. *The San Cristobal*, 215 F. 615, 616 (S.D. Ala. 1914) (emphasis added), *aff'd* 230 F. 599 (5th Cir. 1916); *see also Berry*, 460 F. Supp. at 149 (explaining that only "activities" that are "designed to rescue" the imperiled vessel warrant a salvage award).

Importantly, the intent requirement does not mean that a plaintiff must be acting altruistically; the law recognizes that the promise of financial gain may properly motivate salvors to take risky actions. *Margate*, 143 F.3d at 987 ("salvage awards are not based on the altruistic principle of good samaritanism—that virtue is its own inducement and its own reward"); *B.V. Bureau Wijsmuller*, 702 F.2d at 339 ("Whatever motive impels the true volunteer, be it monetary gain, humanitarian purposes or merely error, it will not detract from the status accorded him by law."); *Offshore Marine Towing, Inc. v.*

*Gismondi*, 504 F. Supp. 3d 1349, 1356 (S.D. Fla. 2020); *Benedict*, Vol. 3A § 68: Voluntariness. Professional salvors exist, and often merit heightened awards, because of their investment in special equipment and the heightened risks they can safely confront. *See B.V. Bureau Wijsmuller*, 720 F.2d at 339-40 (explaining that "a professional salvor is entitled to a more liberal award than a chance salvor" because "professional salvors possess unique skills and must maintain expensive equipment particularly suited for dangerous work"); *The Lamington v. Merritt*, 86 F. 675, 684 (2d Cir. 1898) ("[C]ourts have approved the rule that liberal salvage is to be awarded to [professional salvage organizations] to encourage professional salvors to maintain expensive plants, and keep their vessels manned and equipped for the rescue of distressed vessels."); *Devine v. United Transp. Co.*, 1957 A.M.C. 175, 1956 WL 89486, at *1 (W.D. Wash. July 30, 1956); *The Sahara*, 246 F. 141, 142 (D. Md. 1917); *Benedict*, Vol. 3A § 81: Professional Salvors. Indeed, the rule expects the prospect of financial gain to encourage *more* risky, socially beneficial action by seamen.

So the specific intent requirement exists alongside the fact that salvors may be motivated by financial gain. It prevents plaintiffs from

recovering against defendants who incidentally benefit from the plaintiffs' actions, where those actions were not animated by an intent to relieve *that defendant's* property from peril. But for this rule, any plaintiff could claim *ex post* that they also possessed an intent to benefit defendant's property. That is, the intent requirement ensures that the "reward" guaranteed by salvage law remains a true "reward" for taking risks *for the benefit of the party made to pay for the reward.*

In *Berry*, for example, a plaintiff who "found itself [an] unwilling rescuer" of fishing traps was not entitled to a salvage award despite successfully rescuing and restoring those traps to their owner. 460 F. Supp. at 149. In the court's view, "[t]he benefit to the [owner] was unintentional" because the conduct that conferred the benefit was not "designed to rescue" the salvee's gear, and was instead "based" on "what was best for [the would-be salvor's] vessel, employer and crew and not the needs of the [owner]." *Id*. For that reason, the court concluded that the "public policy reasons for rewarding salvors"—"to encourage mariners to aid one another despite the risk to themselves and their vessels"—"did not come into play [] and would not be served by a

salvage award." *Id.*

One of the implications of this rule is that actions undertaken "for [one's] own safety" which incidentally benefit another ship do not qualify as salvage. *Petition of Sun Oil Co.*, 342 F. Supp. at 982. In *Sun Oil*, after a collision embedded one ship into another, the plaintiff-captain lashed the ships together to reach safety because separating them risked an "immediate possibility" of both catching fire. *Id.* at 980. Notwithstanding the fact that the plaintiff's actions also benefited the defendant's ship, the court declined to award a salvage award because the plaintiff acted for the purpose of saving his own ship. *See id.* at 982 (explaining that "[a]ny reasonable man concerned for the safety of *his ship and crew* could make no other choice" but to save both ships (emphasis added)). The Second Circuit affirmed, recognizing that the district court properly denied a salvage award because the plaintiff was "acting out of concern for [his own ship's] own safety." *Sun Oil Co. v. Govostes*, 474 F.2d 1048, 1048 (2d Cir. 1973) (per curiam); *see also, e.g.*, *The Acorn*, 1 F. Cas. 56, 56 (D. Mass. 1857) (sailors who prevented oncoming ship from colliding with them "acted for [their own]

preservation, and cannot claim as salvors of the other vessel").

An intent to protect one's self is not the only intent that may frustrate a salvage claim. As the Supreme Court recognized nearly a century ago, an intent to benefit third-party property will also defeat a claim for salvage even if the benefits conferred on the third party simultaneously confer a benefit on the defendant's vessel. *See Merritt*, 274 U.S. at 613.

In *Merritt*, a fire broke out on "Pier 5," where a ship owned by defendants was tied. *Id*. at 611-12. Plaintiffs successfully extinguished the flames, then sought a salvage award from defendants' ship. *Id*. at 612. The Supreme Court rejected the claim, holding that the plaintiffs acted "for the purpose of extinguishing fire at and about Pier 5, and to save property not at all related to the [defendants' ship]." *Id*. at 613. While the defendant's ship might have benefited from being relieved of a potential conflagration, the benefit was too "incidental and indirect" to qualify as an act of pure salvage (that is voluntary salvage, as opposed to salvage by contract, which is not at issue here). *Id*.; *see also, e.g., The San Cristobal*, 230 F. at 600 (holding a plaintiff cannot recover a salvage award "based on an indirect benefit incidentally derived from

the services rendered to another"); *Atlantis Marine Towing, Inc.*, 491 F. Supp. 2d at 1101 (A "claim for salvage will not lie when asserted against a vessel that gained an incidental benefit from a salvor's services to another vessel."); *The City of Columbia v. The City of Atlanta*, 56 F. 252, 254-55 (S.D.N.Y. 1893) (denying salvage award because the plaintiff's efforts were "not an independent act, upon the employment or for the benefit of [the defendant's vessel]," and any "indirect benefit" enjoyed by the defendant's vessel was a "mere incident of [the plaintiff's] mode of conducting the salvage service to [a different, third-party vessel]"). Put simply, "'an indirect advantage derived from the rendering of a salvage service to another vessel' cannot be made the basis of an award for salvage"; the service must be "designed to" save the defendant's vessel. *The San Cristobal*, 215 F. at 616 (quoting *The Acre*, 195 F. 1022, 1023 (E.D.N.Y. 1912)), *aff'd* 230 F. 599 (5th Cir. 1916). Salvage law takes the extraordinary step of compelling a party to "reward" a salvor only when the salvor acted specifically for the benefit of that party's property. *See Berry*, 460 F. Supp. at 149.

*Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618 (E.D. La. 2016), a case relied upon below by Plaintiffs, ROA.988 ¶ 18, is not to

the contrary. *Sunglory* stated that services "rendered by accident may be considered 'voluntary' for purposes of a salvage claim." 212 F. Supp. 3d at 651. But that statement has nothing to do with the *specific intent* requirement. Indeed, the case did not address specific intent; it instead analyzed whether the "voluntariness" requirement requires a plaintiff to take some sort of affirmative "act," or if standing by while one's vessel is used as a landing zone for a helicopter in distress suffices. *Id.* at 650-51. The argument, on its face, is questionable: providing a landing pad for a helicopter at sea is hardly doing nothing and plainly entails undertaking risk for the benefit of the helicopter. Regardless, the court found "even very minor acts, such as giving advice or standing by" suffice, and, in any event, the plaintiffs did "considerably more": they secured the helicopter, moved it to allow inspection, lodged and fed the crew, and detoured to deliver the helicopter to port. *Id.* at 632-33, 651. Thus, the fact that the plaintiffs did not initially seek out the rescue did not defeat their salvage claim.

Put simply, *Sunglory* merely recognizes that, in some cases, another vessel in peril may find the salvor, rather than the other way around. In *Sunglory*, that fact did not undermine or even call into

question the salvor's specific intent to benefit the helicopter when it provided the floating landing pad for it, secured the helicopter, and brought it to safety.

In short, authorities—including Supreme Court precedent—broadly agree that admiralty law requires would-be salvors to have the specific intent to confer a benefit on the defendant's property—and not other third parties—to merit a salvage award. The district court's contrary view was legal error.

## B. A Specific Intent Requirement Serves The Policy Aims Of Salvage Law.

A specific intent requirement follows from the role salvage law plays in admiralty jurisprudence more generally. The purpose of salvage law is to reward those who take action in the face of danger at sea to rescue property at peril. *E.g.*, *Margate*, 143 F.3d at 984; *Berry*, 460 F. Supp. at 149; *Benedict*, Vol. 3A § 233: Public Policy. But whenever the law encourages risky behavior, it must do so with care and restraint, lest it promote recklessness and encourage conduct that is, in the aggregate, more harmful than beneficial. *See* William M. Landes & Richard A. Posner, *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism*, 7 J. Leg.

Stud. 83, 95 (1978) (consulted by the Fifth Circuit in *Margate*, 143 F.3d at 986-89).

The need to calibrate the incentives involved in salvage law is central to its core purpose of managing the inherent dangers of commerce and travel over the seas. If salvage law were not to impose significant constraints on when its reward can be available, then the law would, by over-rewarding salvors, encourage recklessness and fail even to aim at the optimal level of safety on navigable waterways. *See Margate*, 143 F.3d at 986 ("a proper" salvage award "gives neither the salvor too little incentive to do the salvage properly, nor the salvee too little reason to care if his property is saved"); *see also The Blackwall*, 77 U.S. at 14 ("Compensation as salvage is ... viewed by the admiralty courts ... as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property."); *The SABINE*, 101 U.S. 384 (1879) (similar).

The "pre-existing duty" exception to voluntariness is one place where salvage law recognizes the need to calibrate incentives. Under this rule, salvage awards are not available for those with legal duties to

render aid to the imperiled ship. A contrary rule would distort the proper incentives to ensure safety at sea. For example, without the pre-existing duty limitation on salvage, the crew of a ship—duty bound to protect it—might otherwise be encouraged to take too little care in light of the prospect of an award derived from saving their own ship from a peril that they failed to avoid. *See Elrod v. Luckenbach S.S. Co.*, 62 F. Supp. 935, 936 (S.D.N.Y. 1945) (discussing the "tempt[ation]" to endanger one's own ship "in order that by extreme exertion [one] might claim salvage compensation"). That is, the law recognizes that a crew's contracted-for earnings ensure an appropriate degree of attention to safety while piloting the ship. Providing crewmen with the *extra* incentive of a salvage award would actually *reduce* overall safety at sea by encouraging crews to place the vessel in some (manageable) degree of peril.

The same rationale withholds salvage awards from various parties with other legal duties, whether public or private, to render service to a ship. For example, a bailee—a party to whom possession of a ship is, by contract, entrusted—is not generally entitled to salvage. *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1020 (5th Cir. 2021).

Likewise, contract firefighters are not entitled to salvage for rendering contract services. *Firemen's Charitable Ass'n v. Ross*, 60 F. 456, 458 (5th Cir. 1893). And neither are other public officers or employees whose actions fall within their duty of ensuring safety on the seas. *EX-USS CABOT/ DEDALO*, 297 F.3d at 386-87 (describing pre-existing duties applicable to "salvage by firemen, pilots, or public officers and employees"). In all of these cases, it is not merely that salvage is an unnecessary incentive—the pre-existing duty already provides the incentive—but, just as importantly, *adding* a potential salvage award on top of pre-existing incentive risks inducing reckless behavior to create *added* peril beyond that which mariners are already under a duty to address.

Like the pre-existing duty rule, the specific intent requirement calibrates the availability of salvage awards to prevent reckless action. Salvage law takes as a given that those who undertake actions for salvage are putting themselves and any of their property involved at risk. The first element of salvage law—that the property being saved faces imminent peril—ensures as much. Given the dangers inherent in acts where salvage may be involved, it is critically important to salvage

law that it *not* provide an excess of incentive to put life and property in danger. Without a specific intent requirement, the potential for salvage rewards would *over*-encourage the risky behavior inherent in efforts to save property in peril, as salvors are lured by the prospect of a lottery-like recovery. Such an incentive structure would put more life and property at risk than even extraordinary efforts could be expected to protect.

The requirement of a specific intent to relieve the salvee's property from peril weeds from salvage awards those whose actions were driven by other urgent needs. For example, when one is impelled to act to protect one's own safety or the safety of third parties, salvage is unavailable. *See supra* I.A. And salvage law would be duplicative where other legal rules and doctrines provide sufficient incentive to act. *See R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 962 (4th Cir. 1999) (opining that the law of salvage is reserved for those who "would [not] incur the costs" of salvage without the inducement of an award).

Without a specific intent rule, people who act to stop potentially cascading disasters could seek salvage awards from a practically endless string of supposed salvees. For example, a person who stops

runaway debris from flowing downriver could later seek salvage compensation from everyone down river—even if the putative salvor could, at the time, merely speculate about the *potential* for harm to downriver property. A world without a specific intent rule may encourage "rescues" even when there is no clear beneficiary, as a vessel downriver may *later* be identified as having been subjected to peril. Drawing vessels toward danger for uncertain, but potentially blockbuster awards is not consistent with the policies salvage law serves. The law does not reward every virtuous and ultimately beneficial act. Indeed, land-based common law is generally averse to legally compelled "rewards." *See Hener*, 525 F. Supp. at 356 (citing Grant Gilmore & Charles Black, *The Law of Admiralty* 532 (2d ed. 1975)). So it should not be surprising that salvage law provides a "limited setting" wherein admiralty provides rewards. *Margate*, 143 F.3d at 984; *see* Landes & Posner, 7 J. Leg. Stud. at 95 (opining that where strong altruism drives rescue, "a legal entitlement to compensation would probably be an unnecessary inducement to rescue, and possibly, therefore, inefficient as well").

## C. The Specific Intent Requirement Disqualifies Plaintiffs From Recovering A Salvage Award.

By failing to apply the specific intent requirement, the court erred. Under the proper principle of law, Plaintiffs cannot recover against ARTCO.

The district court found that that Plaintiffs' actions were driven by an intent that "went beyond protection of Lower River's property and included an intent to save non-Lower River property as well." ROA.1064 ¶ 14. Even accepting this factual finding, the court should have entered judgment in favor of ARTCO. The record could not support a finding that Plaintiffs' actions in beaching ARTCO's barges were "designed to rescue" *those ARTCO barges. See Berry*, 460 F. Supp. at 149. To the contrary, both Nicholas Currault and Troy Currault testified that their plan to beach the barges was driven by an intention to protect *other* property downriver. *See, e.g.*, ROA.1205:15-23, 1300:21-1301:1 (Nicholas Currault); ROA.1393:22-25 (Troy Currault). There is no evidence suggesting that Plaintiffs would have acted any differently had they determined that beaching ARTCO's barges (to protect downriver property) would have *further imperiled* ARTCO's barges. Likewise, there is no evidence that, had the Plaintiffs not

perceived a danger to *other* property downriver, they would have done anything other than push ARTCO's barges to the middle of river and let them pass by Lower River's property. All of the evidence, and all of the court's findings, suggest that Plaintiffs were indifferent to the safety of ARTCO's barges and were concerned instead with the safety of their and *others'* property. That ARTCO barges suffered no further harm downriver was purely incidental to the actions Plaintiffs took. As multiple Plaintiffs testified, their actions at best "wound up" saving ARTCO barges. ROA.1421:18-20 (Troy Currault); ROA.1609:15-16 (Sidney Freeman).[1]

This case is accordingly precisely the kind of effort to expand the reach of salvage awards that the specific intent rule is designed to preclude. Actions that "wind up" relieving a defendant's property from peril should not be awarded in salvage—lest salvage law over-

---

[1] Indeed, other barges landed safely on the banks of the river without any assistance from Plaintiffs. ROA.1810:5-10, 1924:1-1925:8. Given the winding nature of the river, this is not surprising. Even Plaintiffs' own maritime expert could not rule out that other barges "landed on the bank without" Plaintiffs' assistance, and merely opined that ARTCO's barges likely could not have *stayed* beached indefinitely without Plaintiffs' intervention. ROA.1807:18-1810:10.

incentivize risky action. Limiting salvage law to actions taken with the specific intent to save specific property from peril aligns incentives with the long-recognized need to encourage the deployment of reasonable skill at sea to protect life and property. But no more. Here, any benefit to ARTCO was merely an "incidental" and "indirect" consequence of conduct that that is otherwise appropriately incentivized by either self-interest, altruism, or other legal rules. *See Merritt*, 274 U.S. at 613; *San Cristobal*, 230 F. at 600. Plaintiffs' testimony confirms that this is a case where "[a]ny reasonable man concerned for the safety of his ship and crew"—and the safety of their downriver neighbors—"could make no other choice" than what Plaintiffs did here. *Sun Oil*, 342 F. Supp. at 982. In such circumstances, a salvage reward is not available.

Even accepting, as the district court found, that Plaintiffs' actions were commendable, they were commendable for how they were intended to benefit *others* and not ARTCO. The law does not require ARTCO to reward Plaintiffs for their commendable acts. ARTCO owed (and has satisfied) its duty to compensate Plaintiffs for the damage their barges caused to Plaintiffs' property. To the extent that the *others* who Plaintiffs intended to protect were benefited by their efforts, Plaintiffs

could have sought salvage from them. Likewise, to the extent some other legal remedy, like quantum meruit or unjust enrichment, could have provided Plaintiffs a remedy for the benefit they claim to have conferred on ARTCO, they could have sought such relief. But instead, Plaintiffs chose to seek salvage under circumstances that do not warrant it. And salvage law should not be distorted to make it fit this case because of Plaintiffs' strategic decision to seek the (potentially) most financially profitable award.

The salvage claim against ARTCO fails as a matter of law.

## II. The District Court Abused Its Discretion And Applied Erroneous Legal Principles In Awarding 20% Of The Value Of The Salvaged Property.

Even if *some* salvage award was appropriate in this case, the district court's award of 20% of the value of ARTCO's barges to Plaintiffs was unprecedented, excessive, and relied on erroneous legal principles. If this Court concludes that *any* award is warranted, it should significantly reduce the award to align it with longstanding precedent and a well-established legal framework for determining salvage awards.

**A.    The District Court Abused Its Discretion In Setting A Percentage Far In Excess of Historical Practices Without Justification.**

A number of factors, first articulated by the Supreme Court in *The Blackwall*, and later "essentially adopted" by the 1989 Salvage Convention, guide a district court's computation of a salvage award. ROA.1069 ¶ 25. District courts have discretion in applying the factors to compute salvage awards, but the exercise of that discretion is not unbounded. This Court cautions that "[i]n setting the percentage" to be applied to the value of the salved property, courts should "stay within the bounds of historical practice." *Margate*, 143 F.3d at 989. Plaintiffs "bear[] the burden of persuasion regarding salvage value," and "[w]hen a court of appeals finds a salvage award excessive, it may modify the award accordingly." *Allseas Mar.*, 812 F.2d at 247, 249.

Here, the district court failed to meaningfully consult historical guideposts. It provided no citation to any case that comes close to warranting the 20% award it provided here. That alone raises significant doubt about the propriety of the award. But there is more.

When the district court looked for guidance from prior cases, it correctly observed that the circumstances of this case warranted an

award *lower* than that approved in *Margate*. In *Margate*, a tanker worth $7.5 million, with a crew of 25 and a cargo of nine million gallons of oil onboard, spent over *two days* in a tropical storm rescuing a barge carrying a NASA fuel tank. 143 F.3d at 980-82. The rescued barge (and its NASA cargo) was in "imminent danger of complete loss," and because an oil tanker was being used in the salvage operation, there was risk of a "massive oil spill" that would "create[] substantial environmental liability." *Id.* at 981, 985. The district court awarded—and the Fifth Circuit affirmed—a salvage award computed by using 12.5% of the value of the salvaged NASA fuel tank. *Id.* at 983, 995.

To help decide whether the 12.5% percentage was "consistent with the historical pattern in cases of similar nature," or was instead "so excessive as to constitute an abuse of discretion," this Court compiled a list of the "nine largest federal salvage awards in comparable high-value, high-order cases." *Id.* at 993-95. The highest percentage in the Court's list was for 25% of a vessel worth $3 million, salvaged by 100 men over the course of seven days. *Id.* at 995 (citing *The Sandringham*, 10 F. 556 (E.D. Va. 1882)). That 25% number proved to be an outlier, as the next-highest award on the list was for 15.4% of a

vessel worth $22.7 million, salvaged by 67 men over the course of 11 days. *Id.* at 994 (citing *The Omaha*, 71 F. Supp. 314 (D.P.R. 1947)). The other eight percentages on the Court's list were clustered between 12.5% and 3.8%. *Id.* at 994-95 (citing cases). After finding 12.5% to be "smack in the middle" of the range denoted by its list, this Court affirmed the use of 12.5%. *Id.* at 995. The Court noted, however, that *Margate* involved "the largest maritime salvage award in recorded history," and was a "rare" salvage action in that it involved "such high ratings on each of the factors." *Id.* at 979-80, 995.

The differences between *Margate* and the facts here are stark, as the district court acknowledged. As the court noted, "[u]nlike in *Margate*," where the court found *all* the factors supported "'the highest possible award,'" at least three factors did not support the maximum award here. ROA.1088-89 ¶ 46 (quoting *Margate*, 143 F.3d at 985). First, Plaintiffs expended ten hours of labor at most[2] in beaching

---

[2] The court's "10 hour" finding, ROA.1076, 1088 ¶¶ 32, 43, is hard to reconcile with its separate finding that Plaintiffs spent "about seven hours" from around "11:00 p.m. [to] 6:00 a.m" beaching ARTCO's barges, ROA.1051 ¶ 25, and even harder to reconcile with the finding that "approximately 15 minutes" after 11:18 p.m., Plaintiffs were still

ARTCO's barges, compared to the two and one-third days the *Margate* plaintiffs spent on their efforts, and the week or more spent in connection with the other awards the Fifth Circuit reviewed with higher percentages than *Margate*. ROA.1089 ¶ 46. Second, compared to the $7.5 million salving vessel in *Margate*, the SHELL FUELER was valued at $500,000. ROA.1089 ¶ 46. Third, *Margate* took action to save the defendant's property despite incurring a proven risk of a "substantial environmental liability in the event of an oil spill." ROA.1086 ¶ 42. So the amount of risk that the salvors in *Margate* voluntarily undertook vastly exceeded what Plaintiffs put at risk here. In sum, Plaintiffs here spent considerably less time, and faced considerably less risk, during their salvage efforts than that which supported the 12.5% award in *Margate*.

The district court, of course, knew about and cited these differences, which is why it observed that Plaintiffs should receive "an amount less than that awarded in *Margate*." ROA.1089 ¶ 47. But the

---

using the SHELL FUELER's wheel wash to push barges away and thus had not yet begun beaching barges. ROA.1050 ¶¶ 20-21.

court decided that the comparison favored only awarding an *amount* less than that which was awarded in *Margate*, rather than a *percentage* less than that which was awarded in *Margate*. That was an abuse of discretion, as this Court has emphasized that a court may not focus on the dollar amount of the award over the percentage value of the award in salvage cases. *Margate*, 143 F.3d at 990 (holding that preserving the "dollar amount of the award" by "adjust[ing] the percentage" in response to variance in salvaged value "would exceed the district court's discretion"). No doubt, the district court awarded an absolute amount less than the unprecedented award in *Margate*. But that conceals the fact that the award here was 20% of the salved property, which is more than *1.5 times* the percentage awarded in *Margate*.

This court should modify the award to more closely comport with historical bounds and practice, as well as the facts of this case. "When a court of appeals finds a salvage award excessive" or based on erroneous principles, "it may modify the award accordingly." *Allseas Mar.*, 812 F.2d at 247; *see also Compania Galeana, S.A. v. Motor Vessel Caribbean Mara,* 565 F.2d 358, 360 (5th Cir. 1978). In other cases involving findings of significant risk and danger faced by the salvors and a vessel

of high value placed at risk for the salvage operation, courts have awarded less than 11%. *See, e.g.*, *Margate*, 143 F.3d at 994 (citing *Saint Paul Marine Transp. Corp. v. Cerro Sales Corp.*, 505 F.2d 1115 (9th Cir. 1974) (10.6% awarded for 26 hours of work to salvage vessel worth $7.8m with salving vessel worth $20.2m)); *id.* (citing *Usatorre v. Compania Argentina Navegacion Mihanovich, Ltda.*, 64 F. Supp. 370 (S.D.N.Y. 1945), *rev'd on other grounds*, 172 F.2d 434 (2d Cir. 1949) (10.0% awarded for labor expended to salvage $11m vessel)); *id.* (citing *Kuhr v. Sea-Alaska Prods., Inc.*, 1986 A.M.C. 2299 (W.D. Wash. Oct. 21, 1985) (8.7% awarded for two days of work in high risk scenario to salvage vessel worth $10.8m with salving vessel worth $5.6m)).

Here, the district court's findings (as discussed below) do not support an especially high risk posed either to Plaintiffs or their vessel, nor a salving vessel of considerable value. Given the record and the trial court's findings, this case warrants an award below the rates in *Saint Paul Marine* (10.6%), *Usatorre* (10%), and *Kuhr* (8.7%). Treating those as providing the appropriate historical context for any award in this case leads to an award in the range of 3% to 6% of the value of the salvaged vessels.

## B. The District Court's Award Also Is Based On Legal Errors

Two distinct legal errors infected the district court's salvage award calculation. First, the same considerations of third-party benefits that informed the court's intent analysis also distorted its calculation of the award. And second, the court conflated the minimal requirement for "marine peril" that is needed to establish salvage *liability* with the separate requirement to determine the extent of danger posed by the salvage operation that impacts the calculation of the award.

Beginning with the third-party benefits errors, separate from any supposed benefits to ARTCO, the district court found, in a conclusory fashion, that "the rest of the Mississippi River[] benefited greatly from the Salvage Plaintiffs' prompt actions in securing and 'beaching' those barges to prevent them from causing further damage to other property." ROA.1073 ¶ 29. Plaintiffs invited this finding in their opening and closing statements.[3] That finding, however, has no place in the

_____

[3] *See* ROA.1125:5-23 (asking the court to consider, when setting the percentage, that Plaintiffs "prevented a disaster that could have been hundreds of millions of dollars"); ROA.1970:4-9 (asking the court to recognize Plaintiffs' "contribution to the Mississippi River with the substantial salvage award").

calculation of salvage awards.[4]

As this Court made clear in *Margate*, salvage awards are supposed to approximate the salvage fee the parties would have agreed to through "voluntary negotiation in an open and competitive market." 143 F.3d at 986. As is true for all arm's-length agreements, "the twin considerations of cost and benefit will form the poles of negotiation between which any fair bargain must be struck." *Id*. at 987. The *Blackwall* factors "represent an explicit guide for the court to use in measuring these two most significant considerations for voluntary negotiation in the salvage context:" first, the "cost to the salvor of performing the salvage in question," and second, "the benefit that the salvage has conferred on the salvee." *Id*.

Third party benefits are not part of this bipolar negotiation framework. The district court's analysis impermissibly expanded the hypothetical two-party bargain between salvor and salvee into a

_____

[4] Nor does such a finding of protecting the river easily square with the court's finding that Plaintiffs "presented minimal evidence beyond speculation" that their "efforts" spared the environment from harm caused "'by pollution, contamination, fire, explosion or similar major accidents.'" ROA.1070 ¶ 28.

potentially limitless evaluation of supposed benefits to the world writ large. Indeed, Plaintiffs urged an especially broad and unbounded third-party analysis on the district court when they argued that their actions avoided impending environmental harm. The district court rejected that view of the facts, ROA.1089 ¶ 46, even as its finding demonstrated that the court believed, contrary to law, that avoiding environmental harm *could* impact the award. This approach is not proper. *See Margate*, 143 F.3d at 989 (noting the Fifth Circuit "has never" endorsed "general protection of the environment" as a factor for awards). A salvee should not be on the hook for acts by the salvor that benefit third parties, for the same reason that salvors are prohibited from seeking rewards for helping a salvee avert harms to third parties. *See Allseas Mar*, 812 F.2d at 244-45 (holding the award "should not reflect an allowance for the avoidance of liability"); *Dorothy J v. City of New York,* 749 F. Supp. 2d 50, 71 (E.D.N.Y. 2010) (same); *Westar Marine Servs. v. Heerema Marine Contractors*, S.A., 621 F. Supp. 1135, 1140 (N.D. Cal. 1985) (same). To hold otherwise would invite the same "difficulty and raw unpredictability" in valuation that led courts to remove the "reduction in liability" from award computations. *Dorothy J,* 749 F. Supp. 2d at 71.

Turning to the "nature and degree of danger," the district court concluded that it was significant because ARTCO's barges were at risk of "imminent danger of complete loss." ROA.1073 ¶ 30. But its only reason to reach that conclusion was its prior finding that Plaintiffs had met their "*minimal burden* of proving a 'marine peril.'" ROA.1073-74 ¶ 30. (emphasis added). The "marine peril" element required to establish a salvage claim is *not* an "imminent and absolute danger"; instead, it "must simply be present or 'reasonably to be apprehended.'" *Sunglory*, 212 F. Supp. 3d at 647. That standard can be satisfied even in the absence of *actual* danger. *Benedict*, Vol. 3A § 65: Apprehension of Danger ("A situation of reasonable apprehension, though *not of actual danger*, is sufficient." (emphasis added)).

Applying this standard for the "marine peril" element, the district court found ARTCO's barges were "in danger, either 'presently or reasonably to be apprehended,' of causing significant injury or damage to themselves and other vessels or facilities[.]" ROA.1062 ¶ 13. But the finding of a danger "reasonably to be apprehended" is not a finding that ARTCO's barges were in significant danger due to risk of "imminent danger of complete loss." The district court's confusion of the two

further confirms that its award requires reduction.

## CONCLUSION

This salvage case should never have been brought. If Plaintiffs had simply accepted the story that Troy Currault told 10 days before initiating this case, it would not have been brought. The judgment and award issued here is contrary to law and, at a minimum, a clear abuse of discretion plainly out of line with historical precedents. The court should reverse the award and order entry of judgment in favor of ARTCO, or, in the alternative, reduce the award using a percentage of no more than between 3% and 6% to stay within historical bounds.

December 16, 2024

Respectfully submitted,

/s/ Robert N. Hochman

Robert N. Hochman
   *Counsel of Record*
Andrew F. Rodheim
H. Javier Kordi
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
rhohcman@sidley.com
Phone: (312) 853-7000

Marcelle P. Mouledoux
Morgan Kelley
MCGLINCHEY SAFFORD, PLLC

601 Poydras Street, Ste. 1200
New Orleans, Louisiana
Phone: (504) 596-2753
mmouledoux@mcglinchey.com

*Counsel for Defendant-Appellant*
*American River Transportation*
*Co., LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2024, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

Dated: December 16, 2024

/s/ Robert N. Hochman
Robert N. Hochman

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 5th Cir. R. 32.2, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2, this document contains 10,184 words.

This document complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in a size 14-point font Century Schoolbook type style.


Dated: December 16, 2024

/s/ Robert N. Hochman
Robert N. Hochman