Case No. 24-30471

United States Court of Appeals
for the Fifth Circuit

NICHOLAS CURRAULT; ANDRE CURRAULT; TROY CURRAULT; LOWER
RIVER SHIP SERVICE, L.L.C.; SIDNEY FREEMAN,

Plaintiffs–Appellees

v.

AMERICAN RIVER TRANSPORTATION COMPANY, L.L.C., IN
PERSONAM, AND THIRTY-EIGHT ARTCO BARGES AND THEIR CARGO,
IN REM, DOING BUSINESS AS ARTCO FLEETING SERVICES,

Defendant–Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA,
HON. WENDY B. VITTER, CIVIL ACTION NO. 2:23-CV-2542

**BRIEF OF AMICUS CURIAE DIAMOND SERVICES CORPORATION,
TK TOWING, INC., AND TK BOAT RENTALS, LLC**

Harry Morse
BOHMAN | MORSE
400 Poydras St. Suite 2050
New Orleans, LA 70130

*Counsel for Amici Curiae Diamond
Services Corporation, TK Towing, Inc.
and TK Boat Rentals, LLC*

Cayce Peterson
JJC Law LLC
111 Veterans Memorial Blvd.
Heritage Plaza, Suite 810
Metairie, LA 70005

Ian Taylor
Lewis Kullman Sterbcow & Abramson
601 Poydras St Suite 2615
New Orleans, LA 70130

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  Nicholas Currault, André Currault, Troy Currault, Lower River Ship Service, LLC, and Sidney Freeman
    *Plaintiffs-Appellees*

2.  Thomas M. Flanagan
    Anders F. Holmgren
    Matthew R. Slaughter
    FLANAGAN PARTNERS LLP
    *Counsel for Nicholas Currault, André Currault, Troy Currault, Lower River Ship Service, LLC, and Sidney Freeman*

3.  Adam Neely Davis
    ADAM DAVIS LAW FIRM
    *Counsel for Nicholas Currault, André Currault, Troy Currault, and Lower River Ship Service, LLC*

4.  Stephen M. Huber
    Taylor M. Bologna
    HUBER THOMAS, LLP
    *Counsel for Sidney Freeman*

5.  American River Transportation Company, L.L.C., in Personam, and Thirty-Eight ARTCO Barges and Their Cargo, in Rem, doing business as ARTCO Fleeting Services ("ARTCO")
    *Defendant-Appellant*

6.  Robert Hochman
    Andrew Rodheim
    H. Javier Kordi
    SIDLEY AUSTIN LLP

*Counsel for ARTCO*

7.    Kevin Frey
      Morgan Kelly
      Marcelle P. Mouledoux
      MCGLINCHEY STAFFORD, PLLC
      *Counsel for ARTCO*

8.    Greater New Orleans Barge Fleeting Association, Inc. ("GNOBFA")
      *Amicus in Support of Defendant-Appellant*

9.    Jefferson R. Tillery
      Edward F. LeBreton, III
      JONES WALKER LLP
      *Counsel for GNOBFA*

10.   Diamond Services Corporation
      *Amicus in support of Appellees*

11.   TK Towing, Inc.
      *Amicus in support of Appellees*

12.   TK Boat Rentals, LLC
      *Amicus in support of Appellees*

13.   Harry Morse
      BOHMAN | MORSE
      *Counsel for amici Diamond Services Corporation, TK Towing, and TK Boat Rentals*

11.   Cayce Peterson
      JJC LAW LLC
      *Counsel for amici Diamond Services Corporation, TK Towing, and TK Boat Rentals*

12.   Ian Taylor
      LEWIS KULLMAN STERBCOW ABRAMSON
      *Counsel for amici Diamond Services Corporation, TK Towing, and TK Boat Rentals*

# TABLE OF CONTENTS

**Contents**……………………………………………………………………**Pages**

Table of Contents ...................................................................................iv

Table of Authorities ................................................................................v

   I. Interest of Amici .............................................................................1

   II. Summary of Argument ....................................................................2

   III. Argument ........................................................................................2

   1. The district court's opinion accords with
      the history and practice of salvage ................................................2

      a. The history and practice of salvage ........................................2

      b. There has never been a requirement for a specific motive.........8

   2. There are no contrary cases .........................................................13

   3. There is no conceptual basis for a specific motive requirement ...................16

   IV. Conclusion ...................................................................................18

Certificate of Service ............................................................................19

Certificate of Compliance .....................................................................20

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Atlantis Marine Towing, Inc. v. THE M/V PRISCILLA*,
   491 F.Supp.2d 1096 (S.D. Fla. 2007) ................................................................ 15

*American Dredging Co. v. Miller*,
   510 U.S. 443 (1994) ........................................................................................... 16

*B.V. Bureau Wijsmuller v. United States*,
   702 F.2d 333, 338-39 (2d Cir. 1983) ................................................................ 10

*Berry v. Boat Giannina B, Inc.*,
   460 F.Supp. 145 (D. Mass. 1978) ..................................................................... 14

*The Blackwall*,
   77 U.S. 1, 14 (1869) ..................................................................................... 7, 16

*Combo Maritime, Inc. v. U.S. Bulk Terminal, LLC*,
   615 F.3d 599 (5th Cir. 2010) ............................................................................ 12

*Dorothy J. v. City of New York*,
   749 F.Supp.2d 50 (E.D.N.Y 2010) ............................................................... 9-10

*International Aircraft Recovery, LLC v.*
   *Unidentified, Wrecked and Abandoned Aircraft*,
   218 F.3d. 1255 (11th Cir. 2000) ........................................................ 5-6, 7, 17

*The Laura*,
   81 U.S. 336 (1871) ........................................................................................... 16

*Margate Shipping Co. v. M/V JA ORGERON*,
   143 F.3d 976 (5th Cir. 1998) ........................................................ 6, 11-12, 17

*Merritt & Chapman Derrick & Wrecking Co. v United States*,
   274 U.S. 611, 612, (1927) ................................................................................ 15

*Odyssey Marine Exploration, Inc. v. Unidentified Shiprewcked Vessel*,
   657 F.3d 1159 (11th Cir. 2011)) ..................................................................... 5-6

*Orient Mid-East Lines, Inc. v. A Shipment of Rice, etc*,
    496 F.2d 1032, 1034 (5th Cir. 1974) ....................................................3

*RMS Titanic, Inc. v. Haver*,
    171 F.3d 943 (4th Cir. 1999) .............................................................5

*Terral River Service, Inc. v. SCF Marine, Inc.*,
    20 F.4th 1015 (5th Cir. 2021) ...........................................................7

*The Sabine*,
    101 U.S. 384 (1879)...........................................................................3

*Spreckles v. The Steamship Nevadan*,
    1. D. Haw. 359 (D. Hawaii 1903)..................................................... 6-7

*The St. Paul*,
    86 F. 340, 343 (2d Cir. 1989) ...........................................................7

*Sun Oil Co.*,
    342 F.Supp. 976 (S.D.N.Y. 1972) ....................................................14

*Sunglory Maritime, Ltd. v. PHI, Inc.*,
    212 F.Supp. 3d 618, 640 (E.D. La. 2016).................................. 7, 10-11

**Statutes and Other Authorities**

46 U.S.C. App. 729 ..............................................................................3

3A *Benedict on Admiralty* §§ 15-31 ..................................................10

Bolanca, Dragan *et al*,
    *Salvage at Sea - From Roman Law to Modern Time*
    2018 Ius Romanum 239 (2018) ..........................................................3

Holmes, Oliver Wendell,
    *The Human Wheel, Its Spokes and Felloes*
    The Atlantic Monthly (1863).............................................................3

Landes & Posner,
  *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic
  Study of Law and Altruism*, 7 J. Leg. Stud. 83 (Jan. 1978) ........................ 3, 6, 16

Penna, Daphne,
  *Conflict Management in the Mediterranean and the Atlantic*,
  Legal History Library, Vol. 39/15 (2020) .............................................................3

## I.    Interest of Amici

None of amici is a publicly-held company, and no publicly-held company owns 10% or more of any interest in any amicus.

Amicus curiae Diamond Services Corporation is an owner and operator of marine assets, including tugs, barges, and offshore vessels. Diamond Services Corporation is also a fleeter, and a contract salvage company. (A contract salvor negotiates the contract before undertaking salvage. A pure salvor salvages first, then negotiates or files suit.) Therefore, Diamond Services has two interests: as an owner of vessels, Diamond might be in a position to make a pure salvage claim. As a fleeter of vessels, Diamond is likelier to face a pure salvage claim. Diamond's ultimate interest is in ensuring salvage efforts are fairly and justly compensated.

Amici curiae TK Towing, Inc. and TK Boat Rentals, LLC are also the owner and operator of marine assets. TK Towing owns and operates tugs in the Gulf of Mexico and inland waterways, including the Mississippi River. TK Boat Rentals owns and operates barges and smaller vessels. Like Diamond Services, the TK Companies may find themselves making pure salvage claims or paying pure salvage claims, depending on chance and preparedness. The TK Companies have an interest in ensuring that salvage is fairly compensated.

Pursuant to this Court's Rule 37.6, amici certify that no counsel for a party authored this brief in whole or in part, and no person other than amici curiae and

their counsel made a monetary contribution to its preparation or submission. Further,

appellee, appellant, and amicus have all given their consent to the filing of this brief.

## II. Summary of Argument

There are three elements to a salvage claim: marine peril, voluntary act, and

success. Appellant attempts to shoehorn an element of intent or motive into the sec-

ond element, or altogether add specific intent to the analysis as a fourth element.

The law of salvage is old. It has survived, and it is favored, because it works.

Salvage provides an incentive for mariners and vessel owners to undertake risky

salvage efforts to vessels in distress, preventing both harm to those vessels, and

sometimes, even greater harm from what those vessels could do. To accept Appel-

lant's suggestion that there is now a specific motive requirement would diminish the

law of salvage to no purposeful end. Appellant's unworkable rule should not be en-

tertained by this Court. In support of that request, amici of Appellees respectfully

submit this brief detailing the history of salvage law to show that it is contrary to the

history and the purpose of salvage law to require specific intent.

## III.    Argument

*1. The district court's opinion accords with the history and practice of salvage.*

a. <u>The history and practice of salvage.</u>

It borders on unthinkable to address the history and purpose of salvage with-

out calling it hoary, or salty, or (likelier) both. In the common law, a doer-of-good

who gratuitously helps another on land is awarded only whatever feeling of warmth emanating from benefitting the human wheel, its spokes and felloes.[1] Not so at sea. A person who assists in saving a ship or her cargo – or, later, by statute, lives[2] – from impending peril on the sea is entitled to compensation. See *The Sabine*, 101 U.S. 384 (1879); see also William M. Landes & Richard A. Posner, *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism,* 7 J. Leg. Stud. 83 (1978).

Salvage dates to at least the history of Rhodes, circa 600 BC, where the law required seamen to help one another. Someone who privately takes property from a shipwreck was punished, while someone who publicly helped, instead, got a share of the reward.[3] The law was codified by Justinian, along with the law of general average.[4] See e.g. *Orient Mid-East Lines, Inc. v. A Shipment of Rice, etc*. 496 F.2d 1032, 1034 (5th Cir. 1974) (Wisdom, J., addressing general average).

Historically, there has always been tension between salvage and finds, which was likewise codified in medieval Europe (but outlawed in Byzantine and Roman

---

[1] Holmes, Oliver Wendell, 1863.

[2] 46 U.S.C. App. 729 ("Salvors of life to share in remuneration.") A life salvor only gets a salvage award if there is a property salvage with the life salvage.

[3] See generally Bolanca, Dragan *et al, Salvage at Sea - From Roman Law to Modern Time* 2018 Ius Romanum 239 (2018); Penna, Daphne, *Conflict Management in the Mediterranean and the Atlantic*, 1000-1800, June 2020.

[4] The Code of Justinian, Book 11, Chapter 5, disclaims the right of the state to profit from a shipwreck, and further, that those who steal from shipwrecks may be fined or deported. To amici's research, the provisions of salvage in the Code of Justinian involve shipwrecks and found cargo.

law) as *ius naufragii*, the legalized right to take what remains of a ship and its cargo after a shipwreck. *Ius naufragii* was done away with piecemeal through Europe, replaced with broader salvage law, in (among others) the Treaty of the Hague (1625) between the Dutch Republic and England, which France joined in 1662.[5] Article XLIV of that treaty provides that cargo from a shipwreck "shall be restored," with the owner paying the reasonable charges for the cost of salving. Those who instead would steal from a shipwreck are to be chastised with all severity, while pirates were to be found and punished.

It is not hard to explain why our collective sense of justice has tended toward salvage and away from finds. A salvor takes possession, but not ownership, of the salvaged vessel or cargo. The owner keeps ownership of the cargo and pays a reasonable fee. A finder of an abandoned vessel or cargo, in contrast, takes both possession and ownership. The tension is patent: someone who comes across a ship in distress in the Mediterranean might want the vessel to founder. At that point, if the vessel is abandoned, the property (or whatever portion of it survives) belongs to the finder. This is hardly a just or an economically optimal outcome. A salvor, in contrast, has a stronger incentive to act promptly, before the salvaged vessel or cargo is

---

[5] It is surely not accidental that the treaty, where England and the Dutch Republic disclaimed piracy and embraced salvage, shortly postdate the freedom of the Netherlands, and the formation of the British and Dutch East India Companies. Nascent and established maritime powers benefit from salvage, not piracy.

4

abandoned: the more saved, the higher the reward. Both a root sense of justice (helping is better than hurting) and economic optimization (a ship is worth more than a shipwreck) are satisfied through salvage.

Realizing the benefits of a salvage regime over a finds regime, over the centuries, courts have come to apply salvage more readily, and finds more reluctantly. When the Titanic was discovered in 1985, some seventy-five years after she was lost and without a whole lot of hope that she would be floated and remade fit for service, she was not actually found. She was salvaged. *RMS Titanic, Inc. v. Haver*, 171 F.3d 943 (4th Cir. 1999). The Fourth Circuit found that the Titanic was salvaged, not found, with express reference to the benefits of a salvage regime: "Because the law of finds deprives the true owner of a property right," the Court explained, "the courts of admiralty disfavor its application and prefer to apply the law of salvage in its stead." Why? "The law of salvage better serves the needs of maritime commerce by encouraging the saving of property for the benefit of its owner rather than the secretive discovery of property in an effort to deprive the owner of title." So too a crashed U.S. Navy torpedo bomber, lost during World War II, was subject to salvage, not

finds. *International Aircraft Recovery, LLC v. Unidentified, Wrecked and Abandoned Aircraft*, 218 F.3d. 1255 (11th Cir. 2000).[6] Courts broadly apply the law of salvage, because salvage helps reach just, economically-rational outcomes.

More recently, the purpose of the law of salvage has been viewed through the lens of economics, and it is considered a sort of post-hoc contract.[7] As this Court explained in *Margate Shipping Co. v. M/V JA ORGERON*, 143 F.3d 976 (5th Cir. 1998), "[i]n an ideal world, every meeting of salvor and salvee would result in a freely negotiated contract for salvage services priced at a competitive level. In the real world, however, most meetings of salvor and salvee cannot be resolved in this fashion. To accommodate this reality, the law of salvage aims to create a post-hoc solution that will induce the parties to save the ship without first agreeing on terms."

Consistent with centuries of American jurisprudence on salvage, then, there are reasonably clear borders to determine whether a vessel has been salvaged, and if there is a thumb on the scale, that thumb favors salvage. There are three elements necessary to establish a salvage claim, though jurisprudence has established a slight gloss on each. First is a marine peril, where the gloss, consistent with expansive

---

[6] Compare *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159 (11th Cir. 2011) (a Spanish naval vessel sunk in 1804 off Gibraltar was the property of Spain, not the finder. The finder proceeded on a finds basis instead of a salvage basis, presumably wanting all the treasure, not some of it.)

[7] Although Posner and Landes conclude the salvage regime "provide[s] support for the hypothesis that the common law (including traditional maritime law) has been heavily influenced by a concern with achieving efficient allocation of resources" – that is, 'just' and 'economically efficient' have been in concord from the outset.

salvage, is that there need not be imminent peril. It is enough that there be any misfortune or danger which might possibly expose her to destruction or serious injury, were the services not rendered. *Spreckles v. The Steamship Nevadan*, 1. D. Haw. 359 (D. Hawaii 1903); *The St. Paul*, 86 F. 340, 343 (2d Cir. 1989). Further, the owner has the right to refuse the salvage, but that must be express. *International Aircraft Recovery, LLC v. Unidentified, Wrecked and Abandoned Aircraft*, 218 F.3d. 1255 (11th Cir. 2000). This too is consistent with an expansive view of salvage.

The second element of a salvage claim is that service must be voluntarily rendered. When salvage is required as an existing duty – like a tug tending a fleet salvages breakaway barges from that fleet – then no salvage award should follow. *Terral River Service, Inc. v. SCF Marine, Inc.*, 20 F.4th 1015, 1020 (5th Cir. 2021). At first glance, this might seem to be inconsistent with broad salvage, but first glances are all-too-often mistaken: the alternative is to give fleet boats an incentive to allow breakaways, then salvage the broken-away fleet, which hardly accords with a sense of justice or with any economic well-being, except maybe the salvor's.

The third element is success in whole or in part. Here, the gloss is thin: if two parties undertake salvage, the salvage award is pro-rata. The captain gets his share; the owner its; and any unjoined party gets nothing at all. See e.g. *The Blackwall*, 77 U.S. 1, 15 (1869); see also *Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F.Supp. 3d 618,

640 (E.D. La. 2016). That partial success is consistent with a salvage award is again consistent with broad salvage.

Contrary to Appellant's position, there is no judicial gloss or fourth requirement that there must be specific intent to benefit the vessel owner. If the salvor establishes the three elements – marine peril, service voluntarily rendered, and success in whole or in part – the salvor has established a valid salvage claim. The cases where courts have found no salvage award have one consistent theme: the help to the distressed vessel was no more than incidental. That is not the case here.

### b. There has never been a requirement for a specific motive.

Salvage is favored, and it is favored for good reason. As opposed to the law of finds, salvage favors promptness and openness. Instead of winner-take-all finds, a salvor takes a share of the property saved. In an exigency like a hurricane though, the proper comparison is not between salvage and finds. There is no real risk that the plaintiffs would have let the barges sink and then claimed them, piratically, for themselves. The better comparison is to the land-based principle that there is no reward at all, and therefore, less incentive to risk life or property to render aid. The law of salvage here did exactly what it is meant to do. A breakaway barge in a hurricane is a profound danger to the barge, to traffic on the Mississippi River, and to the buildings, levees, and people both on and near the Mississippi River. Risking life and property to stop a breakaway barge from sinking and damaging others – salvage – is

inherently dangerous. When it is done, and when it is done successfully, it deserves to be praised, and it deserves to be remunerated, as it always has been.

Appellant contends that there must be a specific motive to have a valid salvage claim. To be fair, Appellant uses the word "intent," not "motive." Intent is not motive, however. Appellees' intent was to save and beach Appellant's barges. Appellees' motives were to protect their own property, to protect downriver property of others, and also to protect the salved barges themselves. Regardless, there is no motive requirement for a salvage claim. The only requirement of Appellees even approaching motive is the second element of the salvage analysis: whether their action was voluntary and not compulsory, accidental, incidental or inadvertent. This fatal flaw in Appellant's argument may be why it neither addresses nor distinguishes the significant line of cases dealing with owners' claims for salvage for the use of their vessel, separate and apart from the crewmembers' efforts, where the owners' vessel is only an instrumentality, with no knowledge. Courts have routinely found that owners with no knowledge of the salvage nonetheless are compensated, because the root act of salvage was voluntary.

In *Dorothy J. v. City of New York*, 749 F.Supp.2d 50 (E.D.N.Y 2010), the Staten Island Ferry allided with a maintenance pier. A tug, the Dorothy J, came to assistance, and held the ferry in position over several days, to preserve the vessel and the pier while everything could be made fast. The crew undertook this operation

9

alone – the owner had no knowledge that its tug was performing any sort of rescue mission. Still, the owner wanted compensation because its valuable property and time had been applied to the salvage operation. Collecting cases, the Court found that owners are routinely afforded salvage awards even when they do not "take part in, direct, or even know about the salvage operation." *Id.* at 77. Knowledge and participation may increase the share, but the share exists nonetheless.

The far reach of this thesis is more recent, in *Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F.Supp.3d 618 (E.D. La. 2016), where the vessel, and the vessel owner, did not set out to salvage. In fact, neither the owner nor the crew had any idea that its vessel, then at dock, was involved in the salvage of a helicopter when the helicopter landed on the vessel's helicopter deck, but the owner was afforded a salvage award nonetheless. It was an express finding of the Court that neither the pilot nor the co-pilot on the helicopter "was able to contact anyone aboard the Vessel, and the Vessel did not grant permission for the Aircraft to land." *Id.* at 630. There, the crew did not join the salvage suit – only the owners. But the district court held that was of no moment. There was, in a sense, no action from the vessel or the crew. It was the passive recipient of the helicopter. The district court explained that "voluntary," within the second element of a salvage claim, is "not as a service rendered solely

10

from one's free will, but rather performance under the circumstances where the performer is not legally obligated to render the act." *Id.* at 650-51.[8] So holding, the court continued that action, read broadly, can include giving advice, or even standing by. There, post-hoc salvage (tying down the helicopter and giving snacks to the crew after its landing) was nonetheless salvage, voluntarily rendered.

What is missing from *Dorothy J*, from *Sunglory Maritime*, and, to amici's research, all like cases, is any peering into the salvor's mind to determine specific intent. Appellant contends that specific intent is lacking because sure the salvors endeavored to (and did) salvage the barges, but they did so at least in part to protect people and property downriver. And indeed, the testimony reflects that Appellee's motives were many in beaching the barges. Otherwise "[the breakaway] would just affect the next guy downriver." Appellant's brief at 10. Appellees' efforts are not only profoundly more effort that found in *Sunglory*, they are wholly consistent with salvage. Appellees salvaged the barges in part because of potential harm to property downstream, but to protect that property, they had to – and did – protect the barges.

An analogy may assist. Say it were the CHERRY VALLEY and not the POSEIDON and the J.A. ORGERON at risk in *Margate Shipping Co. v. M/V JA ORGERON*, 143 F.3d 976 (5th Cir. 1998). Say the J.A. ORGERON had instead

---

[8] Citing 3A *Benedict on Admiralty* §§ 15-31 and *B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 338-39 (2d Cir. 1983).

come to the rescue, and as the first order of business, had taken the crew off the CHERRY VALLEY, then as a second order of business, thought about saving the vessel. There would not, at the moment the crew was successfully removed, be a claim for salvage because there is no claim for life salvage without a successful property salvage. If the ORGERON abandoned the CHERRY VALLEY, it would have the reward of having saved lives, and that only. Say the ORGERON persisted and salvaged the distressed oil tanker, not principally because of concern over the value of the oil tanker, but because of concern that the CHERRY VALLEY, laden with nine million gallons of heavy fuel oil, would break apart on the Atlantic coast of Florida and cause untold environmental and economic damage. The motive may have been prevention of harm to third parties, but to do that, the ORGERON would have had to, well, salvage the vessel. That is just what happened here. Appellees' salvage was motivated in part by the (profound) risk to downstream people and property. That makes it more salutary, not less.

Or, observed from first principles: The purpose of salvage is to recreate the contract the parties would have entered into. *Margate Shipping Co.*, 143 F.3d at 986. Because salvage requires success, that contract would be no-cure / no-pay. ARTCO, before Appellees salvaged their barges, stood at risk not just for the loss of their barges but for the far greater damage those barges might do to other property downriver. See generally *Combo Maritime, Inc. v. U.S. Bulk Terminal, LLC*, 615 F.3d 599

12

(5th Cir. 2010). ARTCO would gladly pay more for the service on that account. And that returns to the purpose of salvage: when properly applied, it has the salutary effect of aligning incentives.[9]

For their parts, neither ARTCO nor amicus GNOBFA offer a principled reason that salvaging a vessel based on a motivation that included, or even emphasized, benefiting everybody downstream instead of just the barge owner should result in the failure of a salvage award. They cannot, because a salvage award here, shown above, closely comports with the role that salvage has traditionally played. Appellees effortfully and intentionally salvaged the barges. Those efforts intentionally and voluntarily saved the barges. Those efforts, in all likelihood, prevented far greater damage to third parties. Their efforts, and compensation for their efforts, comport with the role that salvage has traditionally played. It comports with the modern, quasi-contractual theory of salvage. There is no principled reason to withhold their compensation for a portion of the property saved.

2. *There are no contrary cases.*

Instead, Appellant and its amicus cite a string of cases where the vessel was not compensated. Those cases where the vessel owner has been deprived of a salvage

---

[9] Except where the work has already been performed, of course. Because the nature of a salvage claim is post-hoc, the owner of the salvaged vessel has every interest in paying as little as possible instead of fair market value.

award are plainly different because they each fail the voluntary element of the salvage test: in each case the salvage was accidental, incidental, inadvertent, or compulsory. The only case where one vessel actively touches another and is deprived of a salvage award is *Sun Oil Co.*, 342 F.Supp. 976 (S.D.N.Y. 1972), but that is a case not just with no specific intent, it is a case with no intent at all. The AMERICAN PILOT and the MAUMEE SUN collided, and they were stuck together. The AMERICAN PILOT brought a salvage claim. As amicus GNOBFA memorably summarizes it, "the safety of the AMERICAN PILOT required that she stay imbedded in the MAUMEE SUN, [so] the plaintiff's acts were not voluntary, and they were not entitled to a salvage award." Brief at 8 – 9.

If the plaintiffs accidentally or unavoidably allided with a breakaway barge and then pushed the barge up on the bank in an effort to save their own vessel, then these facts would align precisely with *Sun Oil Co.* and no salvage claim would be had. But they did not. Appellees' actions saving Appellant's barges were intentional and voluntary, and not accidental, incidental, inadvertent, or compulsory. Even using Appellee's coin of phrase: the plaintiffs intended to beach Appellant's barges, regardless of their motive. But "intent" and "motive" are not the operative words; the required element is whether salvors' actions were "voluntary."

Appellant cites *Berry v. Boat Giannina B, Inc.*, 460 F.Supp. 145 (D. Mass. 1978), where the would-be salvor accidentally brought up lobster traps, then claimed

14

salvage for restoring them to their rightful owner.[10] This case would only be that case if Appellees had accidentally saved the barges, say, by fouling the tug's propeller with a mooring line on the barge, stopping the barge from proceeding downstream. Here though, where Appellees voluntarily salvaged the barges, the comparison does no good for ARTCO's effort to shirk payment.

Nor are cases where the salvor never touched the vessel any help to ARTCO. In *Merritt & Chapman Derrick & Wrecking Co. v United States*, 274 U.S. 611, 612, (1927), the purported salvor put out a fire on a wharf, never touching the LEVIATHAN. No salvage was had. *Atlantis Marine Towing, Inc. v. THE M/V PRISCILLA*, 491 F.Supp.2d 1096, 1101 (S.D. Fla. 2007), which ARTCO cites, makes the opposite point. There, collecting cases, the district court found that no salvage award lies when there is a finding "that no services were actually rendered by the salvors to the subject ships (because the services of the salvors were actually being rendered to other ships and/or the docks themselves)." ARTCO never argues that no services were rendered by Appellees to the subject barges, and ARTCO cannot so argue. Services were rendered and the barges were saved, not because Appellees put out a nearby fire that was threatening the barges – that would be too remote – but because Appellees rescued barges that had broken away in the river.

---

[10] The Court expressly held: "I find that Captain Edwards did not intentionally take up plaintiff's traps in his nets."

*3. There is no conceptual basis for a specific motive requirement.*

The touchstone for the idea behind salvage – and admiralty law is the last bastion of federal common law[11] – is "a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." *The Blackwall*, <u>77 U.S. 1, 14</u> (1869). Continuing, the Court explained that "[p]ublic policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation." *Id.* Or, from an economic vantage point, salvage is a post-hoc contract because "once the ship suffers some calamity necessitating rescue, there may be insufficient time to negotiate with a potential rescuer, that is, another ship that has chanced on the scene."[12]

"[W]hen a salvor comes upon a vessel in distress, he can assume the owner would want assistance." *International Aircraft Recovery, LLC v. Unidentified, Wrecked and Abandoned Aircraft*, <u>218 F.3d 1255, 1261</u> (11th Ci<u>r. 2000</u>) (citing, *inter alia*, *The Laura,* <u>81 U.S. 336, 344-45</u> (1871)). It is telling that in this realm of federal common law that exists to reward good, hard work, successfully performed, for reasons both moral and economic, neither Appellant nor its amicus has suggested

---

[11] See e.g. *American Dredging Co. v. Miller*, <u>510 U.S. 443</u> (1994).
[12] Landes & Posner, *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism,* 7 J. Leg. Stud. 83, 122 (1978).

that appellees did not perform that good, hard work; they have not suggested that Appellees did not save the barges; and they have not explained why their preferred requirement that salvors proof of specific intent to salvage the target barge comports with the purpose behind salvage. It does not.

Finally, it is not difficult to imagine appellant's would-be fourth element of salvage leading to unjust, borderline-absurd results. Continue the CHERRY VALLEY counterfactual above, taking it up when the CHERRY VALLEY and her nine million gallons of heavy fuel oil are at risk, but the crew safely offloaded by the J. A. ORGERON and its crew. Assume the crew is a captain, a mate, and a deckhand. Say, before salvaging the CHERRY VALLEY, the captain aboard the ORGERON said (and believed) he was doing so because, as a fisherman, he was worried potential environmental impact of an imminent spill. Say the mate's family had a house on the beach they rented out, and he was worried about the economic consequences of a beach covered in heavy fuel oil. Finally, say the deckhand was just in it for the money, because he'd heard a salvor gets paid. Under appellant's test, what should the Court do? Presumably, the deckhand would have a valid salvage claim. An ignorant owner recovers, so the owner too would recover. The captain and the mate suffer a different fate. Under appellants' fourth element, they get nothing. What greater good is served by that result? Appellant does not say, and amici cannot divine

17

it. No Court has ever parsed a salvage claim in that manner, and there is no just purpose served by doing so.

Before this Court considers narrowing salvage by finding a specific intent requirement for the first time, it should ask whether that requirement comports with the history and purpose of salvage. That neither ARTCO nor its amicus have sought to argue that their test furthers the goals of this longstanding principle of admiralty law is the best evidence that it does not.

## IV. Conclusion

Appellant's and its amicus's suggestion that this Court should find a specific motive requirement in salvage is not supported by the history of salvage. It is not supported by the idea behind salvage. This Court should reject it.

Date: February 7, 2025          Respectfully submitted:

Harry Morse
BOHMAN | MORSE
400 Poydras St. Suite 2050
New Orleans, LA 70130
Phone: 504-930-4030
harry@bohmanmorse.com

*AND*

Cayce C. Peterson (La. Bar No. 32217)
**JJC Law LLC**
111 Veterans Memorial Blvd.
Heritage Plaza, Suite 810
Metairie, LA 70005
Phone: 504-513-8820
Fax: 504-513-8824

cayce@jjclaw.com

*AND*

Ian F. Taylor (La. Bar No. 33408)
Lewis, Kullman, Sterbcow & Abramson, LLC
601 Poydras St., Suite 2615
New Orleans, Louisiana 70130
Telephone: (504) 588-1500
Fax: (504) 588-1514
itaylor@lksalaw.com

*COUNSEL FOR AMICI CURIAE, DIAMOND
SERVICES CORPORATION, TK TOWING, INC.,
AND TK BOAT RENTALS, LLC*

## CERTIFICATE OF SERVICE

I certify that on this 7th day of February 2025, a copy of the brief of amici curiae Diamond Services Corporation, TK Boat Rentals, and TK Towing has been filed with the Clerk of Court using the CM/ECF system and served via electronic transmission in portable document format (.pdf) to the CM/ECF internet web portal for this Court on all counsel of record.

  s/Harry Morse_____

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 4,562 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32(f)</u>.

2.  This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because this brief has been prepared in a proportionally spaced 14-point Equity Text A typeface using Microsoft Word.

<u>s/Harry Morse</u>
Date: February 7, 2025