# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 8, 2025

Lyle W. Cayce
Clerk

No. 24-30471

---

NICHOLAS CURRAULT; ANDRE CURRAULT; TROY CURRAULT;
LOWER RIVER SHIP SERVICE, L.L.C.; SIDNEY FREEMAN,

*Plaintiffs—Appellees,*

*versus*

AMERICAN RIVER TRANSPORTATION COMPANY, L.L.C., *doing business as* ARTCO FLEETING SERVICES, *in personam*; THIRTY-EIGHT ARTCO BARGES *and their cargo*, *in rem*,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:23-CV-2542

---

Before STEWART, DENNIS, and HAYNES, *Circuit Judges.*
PER CURIAM:[*]

American River Transportation Company, L.L.C. (ARTCO), appeals the district court's grant of a salvage award to Plaintiffs-Appellees Nicholas Currault, André Currault, Troy Currault, Sidney Freeman, and Lower River Ship Service, L.L.C., for the rescue of ARTCO's barges.

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 24-30471

Because Plaintiffs voluntarily and successfully rescued ARTCO's barges from clear marine peril, and the district court—applying the correct legal standards—acted well within its discretion in granting a salvage award that falls comfortably within historical norms, we AFFIRM.

I

This case arises from the successful beaching of twenty-three loose barges on the Mississippi River during Hurricane Ida. Captain Nicholas Currault and his father, Troy Currault, own Lower River Services, L.L.C., which operates a facility and fleet of vessels that provide various services to the marine industry. As Hurricane Ida approached Louisiana on August 29, 2021, the Curraults decided to stay on the River to safeguard their fleet. Nicholas captained Lower River's vessel, the M/V SHELL FUELER, while Troy manned the M/V SAINT CHARLES. Joining them were Nicholas's brother and Lower River employee, André Currault, and a dispatcher for a different marine services company, Captain Sidney Freeman.

Further upriver, ARTCO owned and operated a fleet of roughly 500 barges. Despite the size of its fleet, ARTCO sent all the fleet boats it used to manage the barges into a sheltered harbor in advance of the hurricane. No captains or crew remained on ARTCO's barges when Hurricane Ida made landfall.

That evening in the worsening storm, several of ARTCO's barges broke away from their moorings and began to drift down toward Lower River's fleet. One breakaway ARTCO barge struck the M/V SHELL FUELER. The impact slammed the M/V SHELL FUELER into Lower River's dock, damaging the boat's face wires, generator, rudders, and interior. About an hour later, a second ARTCO barge struck the M/V SAINT CHARLES, and was briefly stuck under the vessel. Three more

No. 24-30471

ARTCO barges approached the Lower River dock before Captain Currault used the M/V SHELL FUELER's wheel wash to push them away.

After consulting with his father, Captain Currault continued to use the wheel wash to "catch" the breakaway barges and "beach" them on the muddy banks of the Mississippi River, where the barges would be safe and unable to damage other property downriver. Captain Currault and his crew repeated this process throughout the night until the following morning.

Conditions during the operation were perilous: high winds from the hurricane battered both Lower River's boats and the breakaway barges. Captain Freeman, who acted as lookout aboard the M/V SHELL FUELER, later testified that it felt like "stick[ing] your hand out the window on the interstate" while being "stung by rain." Any wires or rope hanging off the breakaway barges risked getting entangled with and capsizing their vessel, leaving the crew "dead in the water." The Lower River crew ultimately rescued a total of twenty-three of ARTCO's breakaway barges before conditions improved. Several of these barges were actively or in imminent risk of sinking at the time they were secured on the riverbank.

The Curraults, Captain Freeman, and Lower River filed a marine salvage claim for voluntarily and successfully rescuing the ARTCO barges from peril. The district court held a bench trial and determined that Plaintiffs (1) met all three elements necessary to merit a salvage award and (2) were entitled to an award of twenty percent of the fair market value of the twenty-three breakaway ARTCO barges, amounting to $3,761,500.00. ARTCO timely appealed.

II

We review a district court's salvage award for an abuse of discretion. *Allseas Mar., S.A. v. M/V Mimosa*, 812 F.2d 243, 246 (5th Cir. 1987). A district court abuses its discretion if an award "was based upon incorrect

principles of law or misapprehension of the facts or it is either so excessive or so inadequate as to indicate an abuse of discretion." *Id.* at 246.

### III

ARTCO asserts that the district court (A) erred in finding that Plaintiffs merited a salvage award because they did not possess a "specific intent" to save ARTCO's property and (B) abused its discretion in awarding Plaintiffs $3,761,500 for the salvage operation. We address and reject each argument in turn.

### A

ARTCO's first argument—that Plaintiffs did not have the requisite "specific intent" to warrant a salvage award—fails at the outset. ARTCO has not shown that salvage law conditions recovery on whether salvors acted with the specific intent to rescue defendant's property.

"The doctrine of salvage is settled. 'A successful salvage claim requires three proofs: (1) marine peril; (2) voluntary service rendered when not required as an existing duty or from a special contract; and (3) success in whole or in part, or contribution to the success of the operation.'" *United States v. EX-USS CABOT/DEDALO*, 297 F.3d 378, 381 (5th Cir. 2002) (quoting *Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190, 1200 (5th Cir. 1989)); *see also Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 984 (5th Cir. 1998) ("An award of salvage is generally appropriate when property is successfully and voluntarily rescued from marine peril." (citing *The Sabine*, 101 U.S. 384 (1880))). ARTCO fails to identify any caselaw that requires

No. 24-30471

would-be salvors to show that they acted with the specific intent to rescue a defendant's property.[1]

Accordingly, because there is no dispute that Plaintiffs have otherwise satisfied the three salvage requirements, the district court did not err in concluding that Plaintiffs' actions merited a salvage award.

## B

ARTCO also asserts that the district court abused its discretion in awarding Plaintiffs $3,761,500 for the salvage operation, which constituted twenty percent of the value of the salved property, because the award was incorrectly determined and generally excessive. Neither argument is persuasive.

*First*, the district court committed no legal or factual errors in its determination of the award. Under general maritime law, courts weigh the following six factors to determine the amount of a salvage award:

> (1) The labor expended by the salvors in rendering the salvage service; (2) The promptitude, skill, and energy displayed in rendering the service and saving the property; (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) The risk incurred by the salvors in securing the property from the impending peril; (5) The value of the property saved; [and] (6) The degree of danger from which the property was rescued.

*The Blackwall*, 77 U.S. 1, 13 (1869); *see also Margate*, 143 F.3d at 989 (applying the six-factor *Blackwall* test). Article 13 of the 1989 Salvage Convention

---

[1] We express no opinion on whether a party's lack of intent might bar a salvage award under materially different circumstances.

No. 24-30471

additionally sets forth the following ten factors for courts to consider when making an award determination:

> 1) The salved value of the vessel or other property; 2) The skill and efforts of the salvors in preventing or minimizing damage to the environment; 3) The measure of success obtained by the salvor; 4) The nature and degree of the danger; 5) The skill and efforts of the salvors in salving the vessel, other property and life; 6) The time used and expenses and losses incurred by the salvors; 7) The risk of liability and other risks run by the salvors or their equipment; 8) The promptness of the services rendered; 9) The availability and use of vessels or other equipment intended for salvage operations; 10) The state of readiness and efficiency of the salvor's equipment and the value thereof.

International Convention on Salvage art. 13(1), Apr. 28, 1989, S. Treaty Doc. No. 102-12, 1953 U.N.T.S. 193. While the district court has significant discretion in how it applies these factors to determine a salvage award, "[u]nder our longstanding precedent, [it] is bound to apply all of" them. *Margate*, 143 F.3d at 990.

Here, the district court appropriately determined the award using the relevant standards: it considered the ten Salvage Convention factors and applied each to the facts of this case in consultation with the six *Blackwall* factors and general maritime principles.[2] In doing so, the district court found

---

[2] The parties do not challenge the district court's use of both tests. Because the district court concluded that the Salvage Convention essentially adopted the *Blackwall* factors—and that its analysis and award determination would be the same under either framework—we proceed without deciding whether the Salvage Convention or general maritime law apply here. *See Solana v. GSF Dev. Driller I*, 587 F.3d 266, 270 (5th Cir. 2009) ("We simply assume, without deciding, that general-maritime-law principles are applicable, since, in this case, the result is the same irrespective of whether the general maritime law or the Convention [controls.]").

that Plaintiffs salvaged $18,807,500 worth of ARTCO's property, and that seven of the ten Salvage Convention factors and four of the six *Blackwall* factors weighed in favor of a substantial salvage award. Using the "approved method" of weighing the factors to "arrive at a percentage to be applied to" to the value of the salved property, *id.* at 989, it then concluded that an award of twenty percent of the fair market value of the breakaway barges was appropriate. The district court correctly identified the governing legal standard. And having independently reviewed its reasoning in light of the parties' briefs, we also conclude that its analysis falls within its permissible discretion.

 *Second*, the district court's award was not so excessive as to constitute an abuse of discretion. The "only hard numerical limitation" we have imposed on an award is that the amount of salvage award cannot exceed the "full value of the salved property." *Id.* at 993 (citing *Allseas*, 812 F.2d at 247 (reducing an award from 150% to 67.5% of the value of the salved property)). Where, as here, the district court faithfully applied the *Blackwall* and Salvage Convention factors to arrive at an award well below the full value of the salved property, "the only useful review this court can conduct is a general comparison to similar decisions." *Id.* This "limited review" is conducted in "only the most deferential and general way." *Id.*

 Conducting a "general comparison," the district court's award here falls at the high end of historical practice—but does not exceed it. The court in *Margate* identified nine of the highest-value salvage awards between the advent of the *Blackwall* factors and that opinion's release in 1998 and found that "[t]he range of percentages [applied to high value salvage awards] appears to run from about 4% to 25%." *Id.* at 995. The district court's award of twenty percent fits within that range. *See also id.* at 985 n.11 (observing that the original maritime code from Rhodes limited salvage awards to one-fifth

No. 24-30471

of the vessel's value). The district court therefore did not abuse its discretion in awarding Plaintiffs $3,761,500 for the salvage operation.

## IV

For the foregoing reasons, we AFFIRM the judgment of the district court.